SUE E. PRESTON, APPELLEE, V. RICHARD H. PRESTON, APPELLANT.
486 N.W.2d 902

Filed July 31, 1992.    No. S-89-1495.

Robert M. Brenner, of Robert M. Brenner Law Office, for appellant.

George P. Burke, of Van Steenberg, Myers, Burke & Wilson, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

In this dissolution of marriage action, the respondent-

appellant husband, Richard H. Preston, charges that the trial court erred in its (1) failure to cancel the judgment against him arising from the temporary allowance of child support to the petitioner-appellee wife, Sue E. Preston; (2) property and debt allocations; (3) award of alimony to the wife; and (4) award of an attorney fee to the wife. We affirm as modified.

## II. FACTS

The issues presented by the assignments of error are such that a detailed summary of the record is necessary. The marriage took place on June 15, 1963, and produced four children: Galen, born February 8, 1966; Lara, born August 10, 1968; Christopher, born June 8, 1974; and Daniel, born November 23, 1975. On the date of the trial, November 13, 1989, the husband was 47 years old. While the record does not reveal the wife's exact age, it suggests that at the time of the trial, she too was in her late forties. Unfortunately, as the following paragraph and succeeding pages will reveal, this is not the only area in which the record is less than precise.

In any event, the wife presumably filed this action sometime in late 1988; we say "presumably" because the copy of the petition in the transcript bears no filing stamp. All the record tells us in this regard is that the wife signed the petition in the presence of a notary public on October 5, 1988.

The record does tell us that the husband graduated from college in the fall of 1964 with a bachelor of science degree in philosophy, with minors in physics and mathematics. From 1964 until 1966, he worked as a draftsman and in the area of electrical engineering until he left to enter a seminary in January 1966. He graduated in the spring of 1969 with a master of divinity degree. Beginning in the late 1960's, he also began taking various courses in emergency medicine and advanced emergency medicine technology.

Upon graduation from the seminary, he accepted his first call to yoked parishes in two Iowa towns. He remained at these churches from 1969 until June 1972, when he transferred to a Presbyterian church in Kansas, where he remained until 1978. In April 1978, he was transferred to a Presbyterian church in

Sidney, Nebraska, where he served until October 1987. The record does not reflect why this position ended. He has not served as a pastor since that time, but testified he would not be opposed to accepting a call from a church, should one arise. He stated, however, that there is a surplus of ministers and that it takes a search of approximately 24 months to generate a call.

In 1987, the husband purchased a corporation through which he operated an ambulance service, but this business failed and left him unemployed from May to September 1989. At the time of trial, he was employed by a telemarketing firm in Lincoln, where he worked 30 hours a week and earned an average of $5.50 an hour. In addition, he was temporarily employed for approximately 15 hours a week with a group which raises funds and support for ecological causes, where he earned $7 per hour.

Although the husband testified that he was interested in pursuing a doctorate in health and education in preparation for working as a minister with patients and families, he had not taken any courses in furtherance of this goal.

The wife attended college for four semesters and has, in addition, taken a few business school courses and various continuing education courses in the health and ambulance fields through the technical college in Sidney. She recently completed a 35-hour nurse's aide certification course.

Prior to her marriage, the wife worked for a municipal court doing clerical work and then as a bookkeeper and salesclerk for a jeweler. It appears that after the parties were married, the wife continued to work at various jobs, including clerical and bookkeeping work. The record is unclear, however, as to whether she was employed consistently from 1963 to 1969. The record does tell us that while the parties were in Iowa from 1969 until 1972, she did not work outside the home. During the 6 years that the parties lived in Kansas, the wife was employed in various capacities, including as a nurse's aide in a nursing home, an executive secretary for a development corporation, and an office manager, personnel director, and accountant for a foundry. When the parties moved to Nebraska, the wife continued to work in various temporary jobs, including as a busdriver, a telephone salesperson, a nurse's aide, and a florist's

apprentice. In October 1987, she became employed as a nurse's aide and was so employed at the time of trial. Although there is no testimony as to what she earned when she started such work, other than a reference to "minimum," she did testify to various pay increases, and at the time of the trial was earning $4.50 an hour. In addition, she operates a telephone answering service out of her home, at which she currently earns approximately $250 a month.

At the time of trial, the parties owned no real property, and there is little in the record with regard to personal property owned by them with which the trial court concerned itself. The parties had divided their household goods between themselves. The wife kept china, silver, crystal, and many of the household furnishings with an estimated value of $5,500; the husband kept tools, computer equipment and software, various professional and other books, some amateur radio equipment, and other miscellaneous items with a stipulated value of approximately $10,000. He testified that he brought into the marriage a number of items, including a 1959 automobile worth $800, some amateur radio equipment worth $600, books worth $850, tools worth $250, electronic test equipment worth $300, and a life insurance policy with a $5,000 face value.

The parties also owned a 1969 Volkswagen automobile titled in the wife's name, a 1967 Mercedes automobile titled in both their names, a 1980 Mazda automobile titled in the husband's name, and a 1984 Jeep Cherokee vehicle titled in the husband's name. The Volkswagen had an estimated value of between $750 and $1,000. It was awarded to the wife. The husband was awarded the Jeep Cherokee, which he estimated had a value of $3,200, although he acknowledged that the blue book value was $6,000. The trial court ordered him to pay the wife $2,000 in monthly installments of $150 to "equalize the division of vehicles." The parties stipulated that their daughter was to receive the Mazda and the Mercedes.

The parties also owned five life insurance policies as follows: (1) a Principal Mutual Life policy owned by the husband prior to the parties' marriage and awarded to him, having a cash value of $4,340.92, but according to the husband, this policy is "borrowed to the max . . . there was a hundred dollars left

possibly for loan value, if that"; (2) a Northwest National Life policy having an unencumbered cash value of $2,570, which policy was awarded to the wife; (3) two Woodmen Accident and Life policies owned by the wife, one having a cash value of approximately $700 and the other having no cash value until 1990; and (4) a Guarantee Insurance group policy owned by the wife through her employment, apparently having no cash value. Although the decree is not completely clear (it refers to the three policies owned by the wife in the singular, stating that "[p]etitioner's life insurance policy is set over to her"), we interpret the decree to mean that all policies owned by the wife were awarded to her.

The trial court also awarded to the wife certain telephone answering equipment the parties had purchased. This asset was valued at $1,500.

The husband owned a pension fund derived from his service as a Presbyterian minister. While the trial court makes no specific finding as to the value of the fund, and the testimony regarding its value is confusing, an exhibit recites that as of December 31, 1989, the fund had $8,459.09 of "pension credits." The decree awards the wife 38 percent of the pension fund, to be distributed to her as and when payment is made to the husband. Although the decree is silent on the matter, we read the pension award to the wife to mean that she received 38 percent of the value of the fund as of the undisclosed date on which the wife filed her petition.

During the early 1980's, the husband had inherited approximately $42,000 from his father's estate, receiving $17,000 in cash sometime in mid-1980. That money was spent on various items, including medical bills, as well as on household and general living expenses. In 1982, he received an additional $25,000, which was used to purchase the house in Sidney that the parties acquired in January 1984. While the record tells us this house was sold in January or February 1987, it reveals neither the total purchase price nor the sale price of the property. The record tells us only that the husband applied $25,000 of his inheritance toward the purchase of the house and that $22,342 was realized from its later sale.

The husband also testified that in February 1987, he used the

proceeds from the sale of the house to finance the purchase of the capital stock of the corporation through which he operated the ambulance service mentioned earlier. He bought 72 of the 80 existing shares in the corporation, for a total purchase price of $55,000, paying the $22,000 in cash and signing a note for the balance. He eventually acquired the remaining eight shares and thus became the sole stockholder and president ·of the corporation.

In the husband's opinion, the corporation was bankrupt, and he testified, without objection, that the Internal Revenue Service had told him the corporation was "defunct." However, the record shows that as of the day of trial, the assets of the corporation totaled approximately $43,700, including a building valued at $40,000 and equipment worth roughly $3,700. The corporate debts totaled approximately $40,611.60, including a $22,237.79 mortgage on the building, an $8,551.57 judgment against the corporation, $2,989.24 in accounts payable, a $6,083 debt to the Internal Revenue Service, and what appears to be approximately $750 in miscellaneous expenses. Based on the testimony, the value of the assets of the corporation obviously exceeds the amount of the obligations by $3,088.40. However, the husband still owes $14,000 on the purchase of the capital stock of the corporation. He was awarded all the interest in and obligations of the corporation.

The record establishes the following additional debts: Sidney Roofing, in the amount of $1,300 for repairs to the house the parties owned; Memorial Hospital, in the amount of $438, the reason for the charge not shown by the record. There also is no indication as to the reason for a $500 debt to a Dr. Nelson or a $350.57 debt to Dr. C.W. Cutright. The husband testified that there are bills outstanding for the medical care of the parties' son, Galen, in the amount of $9,600.

In February 1985, the parties borrowed $10,000 from the wife's parents. Half of the loan was spent to repair the house and garage. The remainder was applied toward the creation of High Plains Telecommunication, the telephone answering service mentioned earlier. It is this answering equipment which the wife received at a value of $1,500.

The parties also testified that they each cosigned on their

daughter's student loan in the amount of $4,283.43. There is no evidence, however, which suggests that the daughter has defaulted on the loan or that either party has been approached to pay this obligation.

Thus, the record suggests that the parties are jointly obligated on $22,188.57 of debt, exclusive of the potential liability on the daughter's student loan and of the husband's individual $14,000 obligation for the purchase of the previously described corporate stock. The trial judge ordered the wife to pay half of the $10,000 owed to her parents and ordered the husband to pay the other half and all other debts.

The record further establishes that pursuant to the stipulation of the parties, the two minor boys have been in the husband's custody since at least August 1, 1989. Prior to this time, the boys had been with the wife, and pursuant to a temporary support order, the husband was paying $250 per month in temporary support. After both boys started living with the husband, he stopped making any support payments as of July 1989. The wife made no monetary contribution toward their support. The decree continues custody of the two boys in the husband and orders the wife to pay $225 per month toward their support, commencing December 1, 1989. The decree recites that the husband's

> education, training, experience, age and health are such that it can be reasonably contemplated that he will soon secure employment at substantially higher compensation than he now receives. On the other hand, [the wife's] education, training, experience, age and health are such that it can be reasonably contemplated that she will not soon secure employment at any higher compensation than she now receives. Accordingly, the Court will not at this time forecast what child support obligations will be when the oldest child attains his majority, it being assumed the matter of child support will be again addressed as the parties' financial situation changes.

The husband orally moved that since he had been providing all of the boys' support since July 1989, the trial court should give him credit toward the support payments he had not made. We find no ruling on this motion.

The husband was also ordered to pay the wife alimony in the amount of $150 per month for 12 consecutive months commencing December 1, 1989, and then increasing to $275 per month for the succeeding 48 consecutive months. In addition, the husband was ordered to pay $1,000 toward the wife's attorney fees.

### III. ANALYSIS
#### 1. JUDGMENT FOR TEMPORARY CHILD SUPPORT

The first assignment of error, by which the husband asserts the trial court erred in failing to cancel the judgment arising out of the award of temporary child support, must be resolved against the husband because the record is such that no meaningful review of the issue can be conducted.

Other than a reference to the fact that the amount of the temporary allowance was $250, the sum total of the record on the matter is the following exchange between the husband and his attorney:

[Attorney:] Now, Mr. Preston, I do know that there was a temporary order made. Do you pay support to Mrs. Preston; is that right?

[Husband:] Yes, there was.

[Attorney:] Have you made the support from the month of July on, I mean, meaning to this date?

[Husband:] I thought I had made the July payment, according to the clerk I did not, so from July on I have not made that payment.

[Attorney:] Why have you not done that?

[Husband:] I have not had income, I have had, you know, the boys came in during that time and the expenses definitely did go up during that time and there wasn't money there to pay it.

[Attorney:] Are you asking the Court pursuant to the power of the Court to give you credit for taking and providing 100 percent of the boys' support since July?

[Husband:] Yes, I would, if that is possible.

This exchange does not establish that the temporary support was for child support only. Without the actual order before us, we cannot determine whether the temporary allowance was for

child support, alimony, or both. The applicable rule in this connection is that an appellant has the obligation to present a record which supports the errors assigned; absent such a record, the decision of the lower court is to be affirmed. *Howard v. Howard*, 234 Neb. 661, 452 N.W.2d 283 (1990).

## 2. PROPERTY AND DEBT ALLOCATIONS

The second assignment of error questions the allocation of the property and debts. The oft-repeated general rule which guides the resolution of this and the succeeding assignments of error is that in a dissolution of marriage appeal, an appellate court's review is de novo on the record to determine whether there has been an abuse of discretion by the trial judge, whose judgment will be upheld in the absence of an abuse of discretion. In such de novo review, when the evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Schmale v. Schmale*, 240 Neb. 499, 482 N.W.2d 268 (1992); *Stuhr v. Stuhr*, 240 Neb. 239, 481 N.W.2d 212 (1992).

The principal question concerning the property and debt allocations is whether the ambulance service corporation is to be considered as part of the marital estate.

In a dissolution of marriage action, property acquired by one of the parties through gift or inheritance ordinarily is set off to the party receiving the inheritance or gift and is not considered a part of the marital estate. *Sullivan v. Sullivan*, 223 Neb. 273, 388 N.W.2d 516 (1986); *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982). An exception to this general rule is recognized, however, where both parties have contributed during the marriage to improving or operating the property, or where a party, not owning the property prior to marriage or receiving the inheritance or gift, has significantly cared for such property during the marriage. *Sullivan v. Sullivan, supra*; *Grace v. Grace*, 221 Neb. 695, 380 N.W.2d 280 (1986); *Van Newkirk v. Van Newkirk, supra*.

In *Sullivan*, we noted that

there was no evidence indicating that [the noninheriting spouse] either contributed to improvement or operation

of [the inheriting spouse's] property owned jointly with her brother or that [the noninheriting spouse] had significantly cared for the property during his marriage to [the inheriting spouse]. The record is silent regarding any involvement by [the noninheriting spouse] in the care of [the inheriting spouse's] jointly owned farmland or the farm operations conducted on that property.

*Id.* at 276, 388 N.W.2d at 519. We thus concluded that the inherited property should have been excluded from the marital estate and set over to the inheriting spouse. Here, there is no evidence in the record that the wife contributed to the improvement or operation of the property or that she significantly cared for the property during the marriage. The record shows only that $25,000 of the husband's inheritance was used to purchase a house which was later sold and that $22,342 of the sale proceeds were used to acquire the corporation.

The wife admitted that she had neither a part in this purchase nor any other association with the corporation. It has been stated that if the inheritance can be identified, it is to be set off to the inheriting spouse and eliminated from the marital estate to be divided. See, *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988); *Ross v. Ross*, 219 Neb. 528, 364 N.W.2d 508 (1985). Since the husband's inheritance can be readily traced to the purchase of the corporation and there is no evidence that the wife falls within the *Van Newkirk* exception, the corporation must be excluded from the marital estate and set aside to the husband.

Having removed the corporation from the marital estate, we turn our attention to the remaining property.

Neb. Rev. Stat. § 42-365 (Reissue 1988) provides:

When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities . . . .

While the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately. The purpose of a property division is to distribute the marital assets equitably between the parties. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

In applying § 42-365, this court has repeatedly held that the ultimate test for determining an appropriate division of marital property is one of reasonableness. *Mellor v. Mellor*, 235 Neb. 361, 455 N.W.2d 177 (1990); *Hallan v. Hallan*, 233 Neb. 261, 444 N.W.2d 896 (1989); *Murrell v. Murrell*, 232 Neb. 247, 440 N.W.2d 237 (1989). Although property division is not subject to a rigid mathematical formula, but, rather, turns upon the facts and circumstances of each individual case in light of the factors set forth in § 42-365, *Kimbrough v. Kimbrough*, 228 Neb. 358, 422 N.W.2d 556 (1988), and *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986), it has been stated that the "one-third to one-half" rule in dividing marital property is of particular significance when the marriage is of long duration and the parties are the parents of all the children, see, *Sullivan v. Sullivan, supra*; *Taylor v. Taylor, supra*; and *Koubek v. Koubek*, 212 Neb. 2, 321 N.W.2d 55 (1982).

Here, the parties were married for 26 years and produced four children. The record reveals that both parties were employed consistently throughout the marriage and that both contributed to the support of the family. The marital estate has an approximate value of $33,000. The wife was awarded property having an approximate value of $14,500. She was also awarded $2,000 to equalize the value of the vehicles; thus, the wife was awarded approximately $16,500. The husband was awarded approximately $18,444.64 in property. Taking into account the $2,000 equalization payment, he, too, was awarded approximately $16,500 in property. Thus, at first glance, it would appear that the marital estate was divided equally between the parties.

However, in *Black v. Black*, 221 Neb. 533, 378 N.W.2d 849

(1985), we stated that the debts of the parties should be considered in making a property division. See, also, *Hildebrand v. Hildebrand*, 239 Neb. 605, 477 N.W.2d 1 (1991); *Keim v. Keim*, 228 Neb. 684, 424 N.W.2d 112 (1988). When the debts are considered, it is obvious that the property was not divided equally between the parties. They had $26,472 in current joint obligations. (We obviously do not consider in this figure the potential liability of the parties on the daughter's student loan or the husband's sole liability on the $14,000 he owes in connection with his purchase of the ambulance service corporation.)

The wife was made responsible for one-half of the $10,000 loan from her parents, and the husband was allocated all remaining debts. Thus, the wife received approximately $16,500 in assets less $5,000 in debts, for a net award of about $11,500. The husband, on the other hand, received $16,500 of the marital assets less $17,200 in joint current debts. The wife, therefore, actually received more than all of the marital estate, which is an abuse of discretion.

The decree must therefore be modified so as to obligate the wife to pay one-half of each of the joint obligations of the parties and to require each party to pay one-half of the daughter's student loan, should that go into default. The husband alone is to remain obligated on the debt arising out of his purchase of the capital stock of the ambulance service corporation.

### 3. ALIMONY

Next, in his third assignment of error, the husband questions the award of alimony to the wife.

As noted in part III(2) above, § 42-365 provides that "[t]he purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate." In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness. *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988); *Pyke v. Pyke*, 212 Neb. 114, 321 N.W.2d 906 (1982). The husband testified that he was

earning approximately $660 a month gross at one job and $420 a month gross at a second job, for a total of $1,080 a month. The expenses for himself and the two minor boys were $1,563 a month. The wife testified that she was earning $4.50 an hour as a nurse's aide; pay stubs for the month of October reveal that she earned $679.38 net. In addition, she was earning approximately $250 a month from her telephone answering service, for a total income of a little over $900 a month. She submitted an itemized list of expenses for October of $1,000.75; however, a review of these expenses reveals that not all would need to be incurred every month. In addition, she testified that she had a houseguest during the month of October and that the expenses for groceries and electricity she submitted included costs incurred by the guest.

As stated in *Kimbrough v. Kimbrough*, 228 Neb. 358, 362, 422 N.W.2d 556, 559 (1988):

> In determining whether alimony should be awarded, the trial court should consider what effect, if any, the marriage has had upon the ability of the wife to secure employment in the future and the earning capacity of the husband. . . . Alimony is not to be used simply to equalize the income of the parties or to punish one of the parties. It may be used to assist the other party during a reasonable time to bridge that period of unavailability for employment or for that period to get proper training for employment.

Although it is true that the wife is not in a very good financial position, the husband is in no better position.

In addition, it must be remembered that the husband has custody of the minor children. One consideration in the awarding of alimony is the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children. *Buche v. Buche, supra*; *Brown v. Brown*, 199 Neb. 394, 259 N.W.2d 24 (1977).

In *Hennings v. Hennings*, 233 Neb. 523, 446 N.W.2d 221 (1989), the record showed that the father's net earnings per month were approximately $2,700, while the mother was earning $542 net a month. We found that the father's income was adequate to pay the indebtedness on the residence property

and to support the children, but that it would not justify an award of alimony. We went on to state that "[i]n view of the limited earning capacity of the [mother] and the award of no alimony, we believe the decree should be modified to eliminate the award of child support to the [father]." *Id.* at 524, 446 N.W.2d at 222.

Although in this case the trial court seems to have been under the impression that the husband had a much better likelihood of improving his financial outlook, the record shows otherwise. While it is true that the wife did not have a degree on which she could rely to improve her employment, she has worked continuously throughout the marriage and has had experience in various occupations. On the other hand, the husband had spent 18 of the last 20 years working as a Presbyterian pastor. Therefore, the husband's most likely prospect for employment is as a minister.

Although the ministry may be a respectable and commendable calling, it is not a financially rewarding one. The testimony reflects that the average salary of a Presbyterian minister in 1989 was $13,375. (The record does not tell us the average value of any benefits which may be part of a minister's pay.) Although the husband has a degree in philosophy, with minors in mathematics and physics, this degree, as well as any employment experience in these fields, was attained over 20 years ago. Thus, the record suggests that the husband will continue to experience substantial difficulties in securing lucrative employment.

Under the circumstances, it was an abuse of discretion to award the wife alimony.

### 4. ATTORNEY FEE

Last, in his fourth assignment of error, the husband questions the award of an attorney fee to the wife. The testimony is that while the wife's attorney fee totaled $5,336.37, the husband's totaled $2,476.62.

In addition to the rule stated in subpart (2) above, we have specifically declared that in an action for dissolution of marriage, the award of attorney fees is discretionary with a trial court, is reviewed de novo on the record, and will be affirmed in

the absence of an abuse of discretion. *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990).

The award of attorney fees depends on a variety of factors, among them the amount of property and alimony awarded, the earning capacity of the parties, and the general equities of the situation. *Pittman v. Pittman*, 216 Neb. 746, 345 N.W.2d 332 (1984); *Whitney v. Whitney*, 214 Neb. 565, 334 N.W.2d 799 (1983). In *Ziebarth v. Ziebarth*, 238 Neb. 545, 557-58, 471 N.W.2d 450, 459 (1991), we proclaimed:

> In awarding attorney fees in a dissolution action we consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of questions, and the customary charges for similar services.

See, also, *Murrell v. Murrell*, 232 Neb. 247, 440 N.W.2d 237 (1989); *Hamm v. Hamm*, 228 Neb. 294, 422 N.W.2d 336 (1988).

In view of the routine nature of the issues involved, the size of the marital estate, and the fact that the record fails to detail the work performed to justify the fees charged by the wife's attorney, the award of a fee to the wife also constitutes an abuse of discretion.

## IV. RULING

The decree of the trial court is, as we first noted in part I above, affirmed as modified in this opinion.

AFFIRMED AS MODIFIED.