PHILIP M. KELLY, APPELLEE AND CROSS-APPELLANT, V. LINDA F. KELLY, APPELLANT AND CROSS-APPELLEE.

516 N.W.2d 612

Filed May 27, 1994.   No. S-93-114.

Samuel W. Segrist, of Meister & Segrist, for appellant.

Richard A. Douglas, of Nichols, Douglas, Kelly, and Meade, P.C., for appellee.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

In this action the district court dissolved the marriage of the parties and, among other things, awarded custody of their three minor boys to the petitioner-appellee husband, Philip M. Kelly, and alimony to the respondent-appellant wife, Linda F. Kelly. The wife thereafter appealed to the Nebraska Court of Appeals, and the husband cross-appealed. That court reduced the amount of alimony, but otherwise affirmed the decree of the district court. *Kelly v. Kelly*, 2 Neb. App. 399, 510 N.W.2d 90 (1993). As a consequence, the wife petitioned this court for further review. Although she had assigned a number of other

errors to the district court, in her petition for further review she complains only, in summary, that the Court of Appeals erred in (1) leaving custody of the children with the husband and (2) modifying the district court's alimony award. We granted the petition and now, finding merit in one of the errors assigned to the Court of Appeals, reverse the judgment of that court and direct that it affirm the decree of the district court.

## II. FACTS

The parties met while both were attending college and married on June 23, 1973.

The husband had graduated a year before their marriage, whereupon he entered the Army as an officer, serving on active duty until late 1974. The wife completed 3 years of college and thereafter embarked on a 1-year course of study in Colorado, preparing to be a cytotechnologist, one who examines body fluids for the purpose of diagnosing diseases. In order to help her meet expenses, the husband sent her money each month both before and during the marriage until she graduated in December 1973.

Following his departure from the Army, the husband, in August 1974, entered law school. During this time, he received approximately $300 per month under a federal program and worked part time from May 1975 until he graduated in 1977, earning approximately $300 per month. The wife worked full time from November 1974 until April 1977, earning approximately $600 per month, when the parties adopted the first of three boys, each of whom was adopted within a week of birth. The boys are Brian, born April 13, 1977; Kevin, born February 25, 1979; and Adam, born December 4, 1981.

In August 1977, the parties moved to Gering, Scotts Bluff County, Nebraska, and the husband has practiced law in the area since that time. His annual salary as a partner of a law firm at the time of trial in late 1992 was $70,000; however, his total income from his law practice, after the inclusion of bonuses in recent years, was as follows: 1991, $119,505; 1990, $106,154; 1989, $105,601.

The wife worked part time as a cytologist from 1978 until 1989, taking time off and reducing her hours when the second

and third sons were adopted. At the time of the decree, the wife was in the process of relocating and was looking for employment in her field. She had received one offer of employment to commence at approximately $38,000 per year, with an increase to $40,000 per year once she was reacquainted with the work. It appears that she subsequently accepted a different job sometime between the entry of the October 1992 decree and a subsequent hearing on the issue of child support. That job paid $16.75 per hour, or approximately $34,800 per year.

By the time of trial, the parties had accumulated assets having a net value of $141,073, which the court divided such that the husband received $85,184 net worth of assets and the wife $55,889. In addition, the district court awarded the wife $14,648, half of the $29,295 difference in their respective shares of the net marital estate, to be paid in 60 equal monthly installments, and further ordered the husband to pay the wife alimony in the amount of $1,500 per month for 120 months, commencing November 1, 1992.

As to the custody issue, the husband testified that he actively assisted in all facets of caring for the boys. When they were infants, he sterilized bottles, fixed formula, mixed other food and vegetables, bathed them, changed diapers, and cleaned up after them. He took them to the doctor when they were ill, sometimes by himself and at other times with his wife, and would often leave work so that he could go with the boys to the doctor.

The husband coached the boys' little league baseball teams, sometimes coaching two teams during the same season. He took time off work to attend school activities and sporting events.

He prepared many of the boys' meals, including breakfast, lunch, and supper. For the last 2 or 3 years prior to the parties' separation, he got the boys up, fed them breakfast, and the majority of the time got them ready for school. Sometimes the wife would wake up and join them, and sometimes she would not. He helped the boys with their homework.

The husband emphasized church attendance by the family and would insist that they attend church, while the wife would

make comments that they should skip church and Sunday School, saying, "It is dumb, they don't get anything out of this." Often he accompanied the boys to church meetings without the wife.

He discussed his perceptions of the boys' traits and personalities and their individual needs. He described the wife as one who is very negative in her approach and who says things that are very hurtful to the boys. He, on the other hand, tries to be positive and encouraging, talking to them on a regular basis about what is going on. He seeks to refrain from destroying their spirit when he is angry with them or their behavior.

The husband attempted to act as an emotional buffer between the wife and the boys. He does not feel that the wife can handle the boys' emotional needs. He believes she is physically and verbally abusive to the boys.

As a result, he tried not to wake up the wife in the mornings because, when awakened, she would become upset and get the other family members upset. On two occasions since the parties separated, the wife and one of the boys were involved in physical altercations, hitting each other.

When asked why he did not think the wife could handle rearing the boys, the husband replied:

> There is a basic difference in our approach and our emotional makeup. My job is to nurture the children. My job is to look out for them, and to protect them from harm, and to watch out for their emotions as best as I can. Her emotional makeup is, that she needs the children to nurture her. She is dependent upon the children for her emotional needs, and I am not.

In explaining why he feels she is a negative person, he referred to her negative talk about church and explained that she made comments that the schools are bad, that the teachers are dumb, and that Scottsbluff is a dull place. He considers this to be a bad influence on the boys; in his view, they need to have a positive outlook.

The husband stated that if he were granted custody, he would be able to adapt his work schedule to meet the boys' needs.

Predictably, the wife has a different perspective. She testified that she has been actively involved in raising the boys.

According to her, it is she who has been responsible for their day-to-day needs, since the husband was gone a great deal because of his work schedule. In her view, she was more involved in the discipline of the boys than the husband.

The wife acknowledged, however, that the husband was involved in the boys' activities, including church, swimming, baseball camp, and the like, and was actively involved in caring for them. Prior to the separation, he spent his time involved in family activities when not at work. She believed that his work required him to be gone more than a couple of evenings a month. She admitted that he had stopped participating in an evening golf league after she asked him to do so because one of the boys voiced concerns about it.

She also confirmed that for the 2 years prior to the separation, the husband sometimes fixed breakfast for the boys but denied that he fixed their breakfast and got them ready for school while she stayed in bed each day. She recognized that he had been called twice since their separation to resolve arguments between one of the boys and her.

The husband called as a witness a woman who had been primarily a friend of the wife. The friend lives about eight blocks from the Kelly home, has known the family for approximately 8 years, and typically saw the wife a couple of times a week.

This witness observed the husband in several activities with the children, including attending events with the boys at the swimming pool where she teaches, helping one of the boys who was a substitute on a paper route, showing the boys his trains in the basement, and being with the boys many times when she visited the Kelly home. In her opinion he is a very good, affectionate, supportive, and positive father.

According to her, the wife treated the children as one of her friends and "depends on the kids. Instead of mothering she depends on them, she is their friend." She witnessed a lot of arguing between the wife and the boys and fighting among the boys. She feels that the wife does not have a normal parent-child relationship with the boys because of her yelling at them and the state of turmoil in the home with the yelling among them, which seemed to be constant. But the friend did

say that the yelling in the household also occurred when the husband was around. She never observed either of the parents discipline the boys.

The husband also called a psychotherapist nurse as a witness, who also was of the view that the husband had the better emotional capacity to serve as a parent.

When asked with whom they preferred to live, Brian picked his father, while Kevin and Adam said they would prefer to live with their mother. They all thought their mother was serious about moving away from Scottsbluff. Brian wanted to stay in Scottsbluff; Kevin did not know how he felt about moving; and Adam said, "I want to live with my mom most."

## III. ANALYSIS

With that recitation of the portion of the record which relates to the issues presented by the summarized errors assigned to the Court of Appeals, we turn our attention to the analysis of those matters.

### 1. CUSTODY

In the first summarized assignment of error, the wife attacks the Court of Appeals' affirmance of the district court's custody ruling by complaining that it failed to consider the admissibility of the nurse's testimony. Rather, the Court of Appeals chose to handle her attack on the admissibility of that evidence by observing that it need not address the issue, for even if it were to be that some or all of the nurse's testimony should have been excluded and the Court of Appeals were accordingly to refuse to consider the evidence, the record would nonetheless continue to support the district court's decree in that regard.

Contrary to the wife's contention, the Court of Appeals acted quite properly in that regard, for an appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. Indeed, an appellate decision is not authority for any point not required to be decided in the case then before the court. See *Duggan v. Beermann*, 245 Neb. 907, 515 N.W.2d 788 (1994). It was entirely appropriate for the Court of Appeals to assume without deciding that the nurse's testimony was improperly admitted and to resolve the case based on the remainder of the

record. See, *In re Interest of L.H. et al.*, 241 Neb. 232, 487 N.W.2d 279 (1992) (appellate court in trial de novo on record disregards evidence which should not have been admitted and determines whether remaining evidence justifies termination of parental rights); *In re Interest of Aufenkamp*, 214 Neb. 297, 333 N.W.2d 681 (1983).

Although in dissolution proceedings determinations as to custody are reviewed on appeal de novo on the record, such determinations are initially entrusted to the discretion of the trial judge and will be affirmed unless they constitute an abuse of that discretion. Where credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hansen v. Hansen*, 240 Neb. 31, 480 N.W.2d 204 (1992).

Without giving any consideration to the nurse's testimony, our de novo review of the remainder of the record causes us to independently conclude that the district court did not abuse its discretion in ruling as it did in the matter of custody. While the record does not establish that the wife is an unfit parent, it does demonstrate that the district court could well conclude that the husband, because of his greater patience and ability to relate to the boys, was the better parent and that the boys' interests would be best served by placing their custody in and with him.

In so saying, we are not unmindful that the two younger boys expressed a preference to live with the wife, but such desires are in no sense controlling. See *Dennis v. Smith*, 217 Neb. 147, 347 N.W.2d 873 (1984).

### 2. ALIMONY

In the remaining summarized error assigned to the Court of Appeals, the wife complains of the reduction of the district court's $180,000 alimony award ($1,500 per month for 120 months) to $72,000 ($1,500 per month for 24 months plus $1,000 per month for the next 36 months).

Neb. Rev. Stat. § 42-365 (Reissue 1988) provides, in relevant part:

When dissolution of a marriage is decreed, the court

may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. . . .

While the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately. The purpose of a property division is to distribute the marital assets equitably between the parties. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

The Court of Appeals' decision places undue focus on only a few of the many factors to be considered in awarding alimony, improvidently writing:

" 'The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances . . . make it appropriate.' " Neb. Rev. Stat. § 42-365 (Reissue 1988). Among the factors to be considered in an award of alimony is " 'the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.' " *Id*. Alimony is not to be used simply to equalize the income of the parties, but to assist the economically disadvantaged party during a period of unavailability for employment or training for employment. See *Preston v. Preston*, 241 Neb. 181, 486 N.W.2d 902 (1992). Nebraska statutes and case law clearly indicate that alimony is a means of helping the economically disadvantaged party get through the period of transition after the divorce, until that party becomes self-sufficient, remarries, or dies.

*Kelly v. Kelly*, 2 Neb. App. 399, 408-09, 510 N.W.2d 90, 96 (1993).

It is true that under the circumstances presented in *Preston v. Preston*, 241 Neb. 181, 486 N.W.2d 902 (1992), we held that alimony was not warranted. However, the obligor's monthly expenses therein exceeded his gross monthly income. While that was also the obligee's situation, her shortfall was far less than was that of the obligor. The record also demonstrated that the obligor's income was unlikely to increase greatly. Thus, *Preston* provides no guidance to the proper adjudication of the present case.

Section 42-365 does not define the purpose of alimony to be as narrow as the Court of Appeals concluded. Rather, the final paragraph of the statute indicates that alimony is to provide for the maintenance of one party by another when the relative economic circumstances and other criteria enumerated above make it appropriate. For good reason, neither the statutes nor our decisions have ever enumerated a baseline of income or level of employment potential which would preclude the need for maintenance. As an equitable matter, such a determination must be made on the facts of each case. Indeed, we have noted that in awarding alimony, a court should consider, in addition to the specific criteria listed in § 42-365, the income and earning capacity of each party as well as the general equities of each situation. *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986).

Here, the parties were married for 19 years. The wife made substantial contributions to the marriage and enabled the husband to pursue his studies while they were married and raising a son. Although she reduced her work outside the home after the husband entered the practice of law, she continued to work part time in addition to caring for the children and managing the household until 1989, when they were fairly well established financially. Furthermore, she interrupted the full-time pursuit of her career in cytology in order to care for the children and manage the household.

The ultimate test for determining correctness in the amount of alimony is reasonableness, and the trial court's determination will normally be affirmed in the absence of an

abuse of discretion. *Baratta v. Baratta*, 245 Neb. 103, 511 N.W.2d 104 (1994); *Helms v. Helms*, 234 Neb. 630, 452 N.W.2d 269 (1990); *Ritter v. Ritter*, 234 Neb. 203, 450 N.W.2d 204 (1990).

A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Sabatka v. Sabatka*, 245 Neb. 109, 511 N.W.2d 107 (1994); *Wulff v. Wulff*, 243 Neb. 616, 500 N.W.2d 845 (1993); *Pendleton v. Pendleton*, 242 Neb. 675, 496 N.W.2d 499 (1993).

Thus, in reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result.

It is important to recognize that although the wife is fortunate enough to be able to reenter her career, her income potential is approximately a third of that of the husband. The district court's alimony award tends to even out that disparity and provides the wife with the means to partially recapture the standard of living that she and the husband jointly put together during their 19 years of marriage. Under the circumstances, the district court's award cannot be said to have constituted an abuse of discretion.

## IV. JUDGMENT

Thus, as first mentioned in part I, the judgment of the Court of Appeals is reversed and the cause remanded with the direction that it affirm the judgment of the district court.

REVERSED AND REMANDED WITH DIRECTION.

BOSLAUGH, J., participating on briefs.

WRIGHT, J., not participating.