TOM HIGGINS AND LOIS HIGGINS, HUSBAND AND WIFE,
APPELLANTS, V. RAUSCH HEREFORDS, APPELLEE.

609 N.W.2d 712

Filed May 2, 2000.   No. A-98-1309.

T.J. Hallinan, of Cobb & Hallinan, P.C., for appellants.

Melissa R. O'Rourke, of Morgan, Theeler, Cogley & Petersen, L.L.P., for appellee.

IRWIN, Chief Judge, and SIEVERS and CARLSON, Judges.

CARLSON, Judge.

## INTRODUCTION

Tom Higgins and Lois Higgins, husband and wife, appeal from an order of the district court for Keya Paha County, sustaining a special appearance filed by Rausch Herefords (RH). For the reasons set forth below, we affirm.

## BACKGROUND

On June 11, 1998, the Higginses filed a petition alleging that they are residents of Keya Paha County, Nebraska, and own and operate a cow-calf operation in that county. The Higginses alleged that RH is a ranch operation located near Hoven, South Dakota, engaging in business in Nebraska by advertising and selling cattle to Nebraska residents. The Higginses alleged that on or about March 26, 1996, they purchased 30 head of heifers at $400 each from RH for use as replacement breeding heifers in their cow-calf operation. The Higginses alleged that RH warranted that the heifers were fit for the purpose of breeding heifers. The Higginses stated that RH knew or should have known that said heifers had been implanted with Synovex C, which RH knew or should have known could interfere with the heifers' reproductive ability. The Higginses alleged that 23 of the 30 heifers they purchased failed to conceive and were therefore unfit for the purpose for which they had been purchased. The Higginses alleged that as a proximate result, they lost the value of the expected calf crop for 1 year, with an approximate value of $9,200, and had to purchase replacement heifers at an approximate cost of $12,000. The Higginses alleged that in an attempt to mitigate their damages, they fed the 23 heifers at a cost of $5,409.89 and were able to sell them at an average price

of $819.79 per head or $18,855.17. The Higginses requested damages in the amount of $16,954.72, together with the costs of that action.

On July 17, 1998, RH filed a special appearance pursuant to Neb. Rev. Stat. §§ 25-515.01(2) and 25-536 (Reissue 1995), objecting to the court's jurisdiction over RH. RH requested that the district court sustain its special appearance and objection, and dismiss the Higginses' action. The Higginses subsequently filed a motion to file an amended petition.

On September 11, 1998, a hearing was held on RH's special appearance and the Higginses' motion to file an amended petition. At this hearing, both parties entered affidavits into evidence. In one of these affidavits, Vern Rausch stated that his personal mailing address is the same as RH's and that RH is a general farming and ranching operation located in Potter County, South Dakota. Vern stated that RH operates under a joint operators agreement that was put into writing in November 1996 and that the joint operators of RH include Vern; his wife, Sharon Rausch; Vern's brother Jerry Rausch; Jerry's wife, Vicki Rausch; Vern's son Shannon Rausch; and Shannon's wife, Sue Rausch. Vern stated that he did not sell 30 head of heifers to the Higginses on or about March 26, 1996, and that to his personal knowledge and belief, no other representative or joint operator of RH sold the heifers to the Higginses either. Vern stated that on his own knowledge and belief, Tom Higgins (Higgins), on his own initiative, contacted Gary Rausch of rural Onaka, Faulk County, South Dakota, on or about March 26, 1996, and purchased 25 heifers from Mike and Cindy Schlosser and 5 heifers from Gary. Vern stated that Gary is the son of Vern's deceased brother, Duane Rausch, and that the Schlossers are Duane's daughter and son-in-law. Vern stated that these individuals are not part of RH.

The Higginses offered two affidavits of Higgins into evidence. In the first affidavit, Higgins stated that he is the owner of the Higgins Ranch located in Keya Paha County, Nebraska, that he had knowledge that RH sold cattle in Nebraska over a period of years, and that RH advertised in Nebraska regarding its sale of cattle, including, but not limited to, sending direct mail to the Higginses. Higgins stated that he purchased cattle from RH on several prior occasions in a similar fashion.

Higgins stated that on March 12, 1996, he contacted RH at (605) 948-2281 and (605) 447-5860 regarding the purchase of 30 heifers and attached his telephone bill as confirmation of these calls. Higgins stated that in addition, he called RH on an unspecified date on their 800 number and that the only person he talked to was Duane. Higgins stated that he was never informed in any of the negotiations that the heifers were owned by anyone but RH. Higgins stated that upon delivery of the cattle by RH, he received documents from the trucker, which was the first knowledge he had that anyone other than RH had any interest in the cattle. The documents attached to Higgins' affidavit include a handwritten note signed by Duane and Gary instructing Higgins to make out four checks, one to the Schlossers in the amount of $6,200, one each to Joe and Ben Buntrock in the amount of $1,500, and one to Gary and Twila Rausch in the amount of $2,800. A copy of these checks are attached to the Higginses' petition. Furthermore, in his first affidavit, Higgins states that at no time did he go to South Dakota for the purpose of purchasing the cattle at issue and that all negotiations and acceptance of the contract were done in Nebraska.

In Higgins' second affidavit, he stated that three publications had been sent to him directly by RH and that he does not subscribe to any of these publications. Higgins stated that all three of these publications included advertisements for RH. Specifically, Higgins stated that he had received the 1993-1994 South Dakota Hereford and Cattlemen's Directory, the 1997-1998 South Dakota Hereford Directory, and the October 1997 issue of the Hereford America newspaper. Higgins attached several pages from each of these publications and, in addition, offered the actual publications into evidence. The specifics of these advertisements and their relevance to the instant case will be set out in further detail below. Higgins stated that over the years, he had received advertisements from RH regarding the sale of cattle, and that he has personal knowledge that advertisements similar to the attached exhibits have been sent to other residents of Nebraska.

In a responsive affidavit, Vern stated that he had reviewed both of Higgins' affidavits. Vern stated that one of the telephone num-

bers Higgins called, (605) 948-2281, is a number for Harlan Rausch, not a telephone number for RH, and that one of the other numbers Higgins allegedly called, (605) 447-5860, is the home telephone number of Duane and not a telephone number for RH. Regarding the 800 number that Higgins allegedly called, Vern stated that this number is a telephone number to Vern's home and that therefore, Higgins could not have called that number and discussed a sale of heifers with Duane, because Duane did not live in Vern's house at that time and would not have answered Vern's telephone. Vern further stated that the Higginses could not have purchased 30 black and black-white faced cattle in 1996 from RH, because at that time, RH did not own any black and black-white faced cattle, only purebred Herefords.

In an order filed September 21, 1998, the district court sustained RH's special appearance and dismissed the Higginses' petition. The district court also denied the Higginses' motion for leave to file an amended petition without prejudice to commencing a separate action against substitute defendants.

On September 18, 1998, the Higginses filed a motion for a new trial. On October 19, the Higginses filed an amendment to their motion for a new trial, based on newly discovered evidence. Specifically, the Higginses stated that newly discovered evidence shows that Gary is the registered owner of the animals in question. On November 13, the district court filed an order denying the Higginses' motion for a new trial.

## ASSIGNMENTS OF ERROR

On appeal, the Higginses alleged that the district court erred in sustaining RH's special appearance and in concluding that the court had no personal jurisdiction over RH.

## STANDARD OF REVIEW

When a jurisdictional question does not involve a factual dispute, the determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's; however, when a determination rests on factual findings, a trial court's decision on an issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect. *Crete Carrier Corp. v. Red Food Stores*, 254 Neb. 323, 576 N.W.2d 760 (1998).

ANALYSIS

The Higginses contend that the district court erred in sustaining RH's special appearance and in concluding that the court had no personal jurisdiction over RH. RH argues that the trial court did not err and that the Higginses failed to set forth facts demonstrating that RH has had sufficient contacts with Nebraska. We conclude that the district court properly sustained RH's special appearance, but for a reason other than that cited by the district court. The district court stated that it was sustaining RH's special appearance after finding that RH did not sell to the Higginses the cattle in question. We note that the trial court's determination in this regard was inappropriate for this stage of the proceedings. At this stage, we must take the allegations in Higgins' affidavit as true regarding RH's alleged sale of cattle to the Higginses. Even so, we conclude that the district court correctly sustained RH's special appearance, because on this record, there is insufficient evidence to establish general or specific personal jurisdiction over RH.

█ Personal jurisdiction is the power of a tribunal to subject and bind a particular entity to its decisions. *Castle Rose v. Philadelphia Bar & Grill*, 254 Neb. 299, 576 N.W.2d 192 (1998). Before filing any other pleading or motion, one may file a special appearance for the sole purpose of objecting to a court's assertion or the exercise of personal jurisdiction over the objector. *Id.*

█ Before a court can exercise personal jurisdiction over a nonresident defendant, the court must determine, first, whether the long-arm statute is satisfied and, if the long-arm statute is satisfied, second, whether minimum contacts exist between the defendant and the forum state for personal jurisdiction over the defendant without offending due process. *Holste v. Burlington Northern RR. Co.*, 256 Neb. 713, 592 N.W.2d 894 (1999).

The Nebraska long-arm statute, Neb. Rev. Stat. § 25-536 (1995), provides:

A court may exercise personal jurisdiction over a person:

(1) Who acts directly or by an agent, as to a cause of action arising from the person:

(a) Transacting any business in this state;

(b) Contracting to supply services or things in this state;

(c) Causing tortious injury by an act or omission in this state;

(d) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state;

(e) Having an interest in, using, or possessing real property in this state; or

(f) Contracting to insure any person, property, or risk located within this state at the time of contracting; or

(2) Who has any other contact with or maintains any other relation to this state to afford a basis for the exercise of personal jurisdiction consistent with the Constitution of the United States.

The Due Process Clause of the 14th Amendment operates to limit the power of a state to assert in personam jurisdiction over a nonresident defendant. *Dunham v. Hunt Midwest Entertainment*, 2 Neb. App. 969, 520 N.W.2d 216 (1994), citing *Pennoyer v. Neff*, 95 U.S. 714, 5 Otto 714, 24 L. Ed. 565 (1877). A state may exercise either general or specific personal jurisdiction over a defendant, so long as the defendant has sufficient contact with the forum state. *Dunham, supra*, citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). Under the concept of general jurisdiction, the plaintiff's claim does not have to arise directly out of the defendant's contacts with the forum state, provided that the defendant has engaged in " 'continuous and systematic general business contacts' " with the forum state. *Dunham*, 2 Neb. App. at 973, 520 N.W.2d at 220, quoting *Helicopteros Nacionales de Colombia, supra*. If the defendant's contacts with a forum state are neither substantial nor continuous and systematic, but the cause of action arises out of or is related to the defendant's contact with the forum, a court may assert " ' "specific jurisdiction" ' " over the defendant, depending on the quality and nature of such contact. *Dunham*, 2 Neb. App. at 973, 520 N.W.2d at 220, quoting *Helicopteros Nacionales de Colombia, supra*. Accord *Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474 (9th Cir. 1986).

We must first decide whether RH's activities qualify as "continuous and systematic" or "substantial" to satisfy general personal jurisdiction. In doing so, we must examine all of RH's activities which impact the forum state, " 'including whether the defendant makes sales, solicits or engages in business, serves the state's markets, designates an agent for service of process, holds a license, has employees, or is incorporated there.' " See *Dunham,* 2 Neb. App. at 974, 520 N.W.2d at 220, quoting *Hirsch, supra.*

In the instant case, there is no evidence that RH has designated an agent for service of process, holds a license in Nebraska, has employees in Nebraska, or is incorporated here. In Higgins' affidavit, he stated that RH sold cattle in Nebraska over a period of years and that RH advertised in Nebraska regarding its sale of cattle, including, but not limited to, sending direct mail to the Higginses. The Higginses also introduced into evidence three publications which the Higginses alleged RH had sent directly to them. Specifically, these three publications are the 1993-1994 South Dakota Hereford and Cattlemen's Directory, the 1997-1998 South Dakota Hereford Directory, and the October 1997 issue of the Hereford America newspaper. These advertisements contain an 800 number that persons interested in purchasing cattle can call.

This is the only evidence on this record that RH makes sales in Nebraska, solicits or engages in business in Nebraska, or serves this state's markets. On this record, there is no evidence as to the specific amount or the frequency of RH's advertising. We note that when confronted with a special appearance, the plaintiff has the burden of proof to establish facts which demonstrate the court's personal jurisdiction over the defendant. *Dunham, supra.*

In regard to the question of general jurisdiction, we look to *Helicopteros Nacionales de Colombia, supra,* in which the U.S. Supreme Court found that sending a corporate executive to the forum State of Texas for contract negotiations, accepting checks drawn on a Texas bank, purchasing equipment from a Texas company for substantial sums, and dispatching personnel to Texas for training did not amount to continuous and systematic contact. Furthermore, in *Dunham v. Hunt Midwest*

*Entertainment*, 2 Neb. App. 969, 520 N.W.2d 216 (1994), this court examined the relationship of Missouri's Worlds of Fun amusement park to Nebraska. After doing so, this court held that the Missouri amusement park was not shown to have had continuous and systematic business contacts with Nebraska so as to provide a Nebraska court with personal jurisdiction in Nebraska over an injured park patron's actions against the park. This court held that this was true, despite the fact that the park advertised on the radio and television in Nebraska and that park discount coupons were available in Nebraska. In *Dunham*, the park was not authorized to do business in Nebraska, had no employees in Nebraska, and did not maintain an office or do any business in Nebraska.

We conclude that in the instant case, there is insufficient evidence showing that RH had continuous and systematic business contact with Nebraska sufficient to warrant personal general jurisdiction over RH.

▮ The exercise of specific jurisdiction under § 25-536(2), permitting jurisdiction on any basis or contact which does not run afoul of the protections of the Due Process Clause of the 14th Amendment, entails three basic requirements. In *Dunham, supra*, this court laid out those requirements, citing *Lake v. Lake*, 817 F.2d 1416 (9th Cir. 1987). In *Lake*, 817 F.2d at 1421, the Ninth Circuit outlined them as follows:

> (1) [T]he nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or residents thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

▮ "Purposeful availment" means that the defendant's connection with the forum state must be deliberate and substantial, involving significant activities or continuing obligations. *Dunham, supra*, citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). The con-

nection cannot be random, fortuitous, attenuated, or the result of another party's unilateral activities. *Id.* See, also, *Gray v. Lewis & Clark Expeditions, Inc.*, 12 F. Supp. 2d 993 (D. Neb. 1998).

According to the *Burger King Corp.* analysis, whether a Nebraska court has personal jurisdiction over a nonresident defendant depends on whether the defendant's contacts with Nebraska are the result of unilateral acts performed by someone other than the defendant, or whether the defendant himself acted in a manner which creates substantial connections with Nebraska, resulting in the defendant's "purposeful availment" of the benefits and protections of Nebraska law.

In the instant case, the question is whether RH's advertisements in the South Dakota Hereford and Cattlemen's Directory, the South Dakota Hereford Directory, and Hereford America and the fact that RH has an 800 number prove that RH purposefully directed its activities at Nebraska residents with the goal of enticing Nebraska residents to purchase cattle from RH. We hold that the evidence on this record is insufficient to prove that RH purposefully directed its activities at Nebraska.

In *Gray, supra,* the court held that a Wyoming corporation had not purposefully availed itself of the laws of Nebraska by conducting river rafting expeditions, advertising in national directories, maintaining an 800 number, and accepting Nancy Gray's reservation and credit card number over the telephone during a call she initiated from Nebraska. The court held that such activities did not demonstrate "purposeful availment" to the laws of Nebraska. More specifically, the court stated:

> In the present case, the only activities by Defendant that potentially could be deemed as directed at Nebraska are: advertising in camping publications that make their way to the state, maintaining an 800 number available to Nebraskans, and accepting Nancy Gray's reservation and credit card number over the phone during a call she initiated.
>
> Advertising in national directories and publishing 800 numbers does not indicate an intent to serve a particular market or area, and demonstrates nothing about whether such business was actually generated. Without evidence of additional sales or facts showing Defendant was the aggres-

sor in the transaction, this lone contact initiated by Nancy Gray must be characterized as an isolated one that does not show purposeful availment of the Nebraska market. *Welsh v. Takekawa Iron Works Co., Ltd.*, 529 N.W.2d 471, 475 (Minn. App. 1995) (single proven in-state sale is not sufficient to establish jurisdiction over nonresident manufacturer). The present case is distinguishable from the finding of purposeful availment in *Dunham*, where evidence showed the defendant specifically targeted the Omaha, Nebraska, market by advertising on local broadcast stations. *Dunham*, 2 Neb. App. at 970, 520 N.W.2d at 219.

12 F. Supp. 2d at 997.

In the instant case, Higgins appears to argue that RH's sale of cattle was not an isolated incident. Specifically, in his affidavit, Higgins stated that he had knowledge that RH sold cattle in Nebraska over a period of years and that he had purchased cattle from RH on several prior occasions. Higgins' affidavit does not give any indication of the number of Nebraska residents RH may have sold cattle to in the past besides the Higginses. In his affidavit, in essence, Higgins stated that he purchased cattle from RH after receiving certain publications from RH in which RH advertised its sale of cattle. Specifically, Higgins stated that RH had sent him three publications directly: the 1993-1994 South Dakota Hereford and Cattlemen's Directory; the 1997-1998 South Dakota Hereford Directory, and the October 1997 issue of the Hereford America newspaper. Higgins also stated that RH had sent other Nebraska residents similar publications and that RH maintains an 800 number which is available to Nebraska residents.

Although RH's sending of the above publications to the Higginses might suggest at the outset that RH was the aggressor in the sale of cattle to the Higginses, a review of those publications shows otherwise. Although each of the publications allegedly sent by RH to the Higginses contains an advertisement placed by RH, each of those publications is filled with advertisements from various companies selling cattle. There is nothing in those publications which would single out RH in any way. This said, it can hardly be claimed that RH's sending of those publications directly to the Higginses and other Nebraska resi-

dents constitutes RH's purposeful availment of the Nebraska forum. Similarly, RH's 800 number and its previous sales to an undisclosed number of Nebraska residents does not indicate an intent by RH to serve Nebraska.

Additionally, this is not a case like *Dunham v. Hunt Midwest Entertainment*, 2 Neb. App. 969, 980, 520 N.W.2d 216, 224 (1994), in which this court stated:

> In the case at hand, there can be no doubt on this record that Worlds of Fun has purposefully directed its activities at Nebraska residents with the goal of enticing them to travel to its amusement park in Missouri to spend their entertainment dollars at that location, all to the presumed profit of Worlds of Fun.

Because we conclude that RH did not purposefully direct its activities at Nebraska, we do not discuss the other two requirements set forth in *Lake, supra.* An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994).

## CONCLUSION

For the reasons set forth above, we conclude that the district court did not err in sustaining RH's special appearance and in dismissing RH's petition.

AFFIRMED.