SANDRA J. HALOUSKA, APPELLEE,
V. RONALD L. HALOUSKA, APPELLANT.
585 N.W. 2d 490

Filed October 6, 1998.   No. A-97-546.

Michael E. Piccolo, of Clough, Dawson & Piccolo, for appellant.

Susan C. Williams for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## INTRODUCTION

This is an appeal from a decree dissolving the marriage of Ronald L. Halouska and Sandra J. Halouska. Ronald appeals on the grounds that the trial court erred in (1) computing the parties' net monthly incomes, (2) computing child support, (3) computing the amount and duration of alimony, (4) determining the values of marital assets and debts, (5) dividing the marital estate, (6) assessing all of the guardian ad litem fees to him, and (7) ordering that the debts assigned to him are nondischargeable in bankruptcy.

## BACKGROUND

Ronald and Sandra were married on August 2, 1975. Two children were born of the marriage, Jody, age 21 at the time of trial, and Jill, age 13 at the time of trial. On July 3, 1996, Sandra filed for divorce, and an ex parte nonhypothecation order was entered ordering that Ronald "be restrained from selling, assigning, concealing, or liquidating any or all of the real estate or personal assets of the parties, individually or collectively, except in the usual course of business during the pendency of this action." On August 5, the court granted Sandra's motion that Ronald be excluded from the family home, granted a restraining order against him, and entered a temporary nonhypothecation order for the pendency of the divorce.

Trial was held on March 25, 1997. Ronald and Sandra were the only witnesses. The trial court awarded joint physical and legal custody of Jill to the parties, with physical custody to rotate every 6 months. Using the parties' 1996 incomes, the trial court ordered Ronald to pay child support of $142 per month until Jill reaches the age of majority, dies, becomes emancipated, marries,

or until further order of the court. The court also ordered Ronald to pay alimony of $400 for 120 months or until the death of either party or the remarriage of Sandra, attorney fees of $1,000, costs, and the entire guardian ad litem fee of $763.75. Sandra was awarded one-half of the value of Ronald's "Tier II Railroad Retirement" which accrued during their marriage.

In addition to the retirement account, according to the trial court's calculations Sandra was awarded property the value of which was $157,781.27 and debts of $97,691.89, for a total net award of $60,089.38 (51 percent); Ronald was awarded assets valued at $64,864.24 and debts of $6,538.85, for a total net award of $58,325.39 (49 percent). Included in Ronald's property award were a Pacific Brokerage Services account valued at $3,655.48 which he testified had been liquidated and used to pay marital debt; a Euro-Atlantic Securities account valued at $5,223.08 which he testified had been liquidated to pay real estate taxes on the parties' rental house in which he was living; five credit card accounts the balances of which were listed as "unknown" in the court's schedule awarding property; and two credit cards at balances which were substantially lower than those proposed by Ronald. All the debts assigned to Ronald were declared by the court to be in the nature of support and maintenance and thus, nondischargeable in bankruptcy.

## ASSIGNMENTS OF ERROR

Ronald appeals to this court, asserting that the trial court erred in determining the parties' net monthly incomes, consequently erring in child support and alimony calculations; in determining or failing to determine the value of marital assets and debts and in dividing those assets and debts; in assessing all of the guardian ad litem fees to him; and in ordering that the debts assigned to him are nondischargeable in bankruptcy.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Priest v. Priest*, 251 Neb. 76, 554 N.W.2d 792 (1996). This standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees.

■ The division of a marital estate in a dissolution case is initially left to the discretion of the trial court and will be reviewed by an appellate court de novo on the record and affirmed absent an abuse of discretion. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id.* If the evidence, as presented by the record, is in conflict, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

An award of alimony is a matter entrusted to the discretion of the trial court, and on appeal, it will be reviewed de novo on the record and affirmed in the absence of an abuse of discretion. See *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Prochaska v. Prochaska*, 6 Neb. App. 302, 573 N.W.2d 777 (1998).

## ANALYSIS
*Income and Child Support.*

In determining what amount of child support to award, the trial court used the parties' 1996 incomes as reported on Ronald's W-2 form and Sandra's 1099 form. Ronald argues that the trial court overestimated his income and underestimated Sandra's and consequently erred in determining child support. In support of this contention, he alleges that the court should not have used the 1996 incomes of the parties, because they are not representative of present earning capacity.

Ronald asserts that the trial court overestimated his income by using his 1996 income rather than his projected 1997 income based on his earnings during the first 2 months of 1997. He testified that his employer, Union Pacific, made several changes in its staffing techniques in 1997, primarily due to budget con-

cerns, and alleges that these changes would decrease the amount of overtime he could work and also decreased the total amount of hours worked by vacation relief employees, of which he is one.

It is true that it is appropriate to consider overtime wages in setting child support only when overtime is a regular part of the employment and the employee can actually expect to earn regularly a certain amount of income from working overtime. See *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991). However, in the instant case, there is no evidence in our record which allows us to determine what portion, if any, of Ronald's previous year's income was attributable to overtime or during which months it was accrued. Thus, absent Ronald's bare assertion, we have no firm evidence that Ronald's 1997 income will be substantially lower than previous years'. It is also plausible that he has refused to work overtime in order to present evidence to the court of a lower income. Ronald's 1996 income of $41,191 is not dissimilar to his pretax income from previous years—$41,449 in 1993, $38,737 in 1994, and $46,767 in 1995. We conclude that the trial court did not abuse its discretion in using Ronald's 1996 income figures in determining his earnings for child support and alimony purposes. Therefore, the district court's determination that his monthly net earnings for child support purposes were $2,274.68 was not erroneous.

Ronald argues that the trial court erred in using Sandra's 1996 income to determine child support and alimony because it does not accurately reflect her earning capacity. In determining the amount of child support to be paid by a parent, the court must consider the earning capacity of each parent and apply the Nebraska Child Support Guidelines adopted by the Nebraska Supreme Court. *State on behalf of Hopkins v. Batt*, 253 Neb. 852, 573 N.W.2d 425 (1998). It is uncontested that Sandra did not work for several weeks in 1996 due to a health problem. Sandra admits that this may have affected her income for the year.

Sandra's reported income in the 3 years preceding 1996 was $61,233 less expenses of $19,049, for a gross income of $42,184 in 1993; $47,258 less expenses of $17,709, for a gross income of $29,549 in 1994; and $36,309 in gross income in

1995, a year for which the tax evidence in our record is limited. The 1996 "after expense" figure used by the trial court, $17,197, was based on Sandra's 1996 Form 1099 income of $33,837, after deducting actual office expense of $1,641 and estimated additional business expenses of $15,000. After deducting a flat 25 percent for income taxes, the monthly net income of $1,074.75 was arrived at. Using this figure and a net monthly income figure for Ronald of $2,274.68, the trial court determined by applying the basic net income and support calculation worksheet of the Nebraska Child Support Guidelines that Ronald owed Sandra $141.84 per month for child support.

In 1996, Sandra was off work for 6 weeks to 2 months for surgery and stated that "[i]t really did slow down this year. It really did." She admitted at trial that she currently had no health problems that would affect her ability to work and stated that she plans to continue working full time as a real estate agent. There was considerable testimony from her about the "feast or famine" general nature of a real estate career. However, she offered no testimony or documentation regarding whether actual listings or sales were currently below previous years'. It is clear that Sandra's 1996 income was an anomaly, and we find that the trial court abused its discretion in relying solely on it in determining Sandra's income for support purposes.

■ The Nebraska Child Support Guidelines provide that in the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the amount of child support owed by each parent. See Nebraska Child Support Guidelines, worksheet 1 n.5. By averaging Sandra's pretax income for the years 1994 through 1996, we find that Sandra earned an average of $27,684 per year. Using the worksheet for joint physical custody and Sandra's average income with an estimated tax rate of 25 percent (a percentage which Sandra used below and which is unchallenged on appeal), we determine Sandra's net monthly income to be $1,730. Using Ronald's 1996 income and deductions as figured by the trial court to determine Ronald's net monthly income, $2,275, we determine that Ronald owes Sandra $65 per month in child support. Therefore, the trial court's award of $141 per month is modified as stated.

*Alimony.*

The trial court awarded Sandra alimony of $400 for 120 months. In doing so, the district court expressed that it was basing the alimony award on the same income figures as used in its child support calculations, which were essentially those found in Sandra's proffered worksheet. Ronald argues that the trial court should have considered the parties' earning capacity as well as the factors enumerated in Neb. Rev. Stat. § 42-365 (Reissue 1993). He asserts that Sandra's earnings over a period of years should also be used to determine alimony, because her 1996 earnings were substantially lower than her earnings in the 3 years prior to her filing for divorce. He argues that her earning capacity would be a more accurate forecast to determine alimony and that when this is considered, their incomes are not significantly different and alimony is not appropriate in this case.

Section 42-365, relating to an award of alimony, provides:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party. . . .

> While the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately. The purpose of a property division is to distribute the marital assets equitably between the parties. The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate.

A decision whether to award alimony must be made on the particular facts and equities of each individual case, and the court must consider all of the facts and equities, in addition to

738

those factors specifically enumerated in § 42-365. The ultimate test for determining correctness in the amount of alimony is reasonableness, and the trial court's determination will normally be affirmed in the absence of an abuse of discretion. *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994). In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. *Id.*

The record reflects that during the 21-year marriage, both parties worked outside the home, contributing their income to the marriage. Ronald worked continually for the railroad since early in the marriage. He now earns approximately $41,000 per year. Sandra worked for minimum wage during the majority of the marriage in a variety of jobs, some part time and some full time, including at the telephone company and at a jewelry store. Although she worked a variety of entry-level jobs, she did not present any evidence to show that she interrupted her education or a career to marry Ronald or raise their family. In fact, both parties testified that they were both actively involved in raising their children and managing the household.

In 1988, Sandra went to school for one semester. In 1989, she became a real estate agent and since that time has become quite successful, receiving numerous awards and incentives, including at least 10 trips to conferences and conventions for real estate agents, in places such as Puerto Vallarta, Bermuda, Puerto Rico, San Francisco, San Diego, New Orleans, Orlando, Dallas, and Las Vegas. Sandra has been the top real estate agent for 5 or 6 years in a row and during at least 1 year was the top listing agent. She has taken continuing education classes and is close to completing her Graduate Realtors Institute certification, which will assist her in out-of-town referrals and add distinction to her career.

In addition to the specific criteria listed in § 42-365, a court setting alimony is to consider the income and earning capacity of each party, as well as the general equities of each situation. *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996). At the time of the divorce, Sandra was earning between $29,500 and $41,000 per year. Ronald earns approximately

$41,000 per year. Each party is gainfully employed and expects to continue such employment.

Based on the evidence before us, and as stated, it is quite apparent that Sandra's 1996 income was not representative of her earning capacity. Even averaging it with her 1994 and 1995 income and ignoring the higher 1993 income of $42,184, there is not a wide disparity in income between the parties. See *Kelly v. Kelly, supra* (noting that when wife had earning capacity of $34,000 and husband's was $100,000, alimony award of $1,500 per month for 120 months was not abuse of discretion as it, inter alia, tended to even out income disparity).

The parties share equal joint custody of their minor child, and both their careers offer flexibility and will not interfere with their child-rearing responsibilities or affect Jill's interests. Considering the facts and circumstances of this case, we conclude that the trial court abused its discretion in ordering alimony in the amount of $400 per month for 120 months. It is fairly apparent that viewing the figures as accepted by the district court, this award essentially equalized the parties' income. While it is acceptable to "even out" a disparity, see *Kelly v. Kelly, supra*, that is not the primary purpose of alimony, see, e.g., *Ainslie v. Ainslie, supra*; *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995); *Ziebarth v. Ziebarth*, 238 Neb. 545, 471 N.W.2d 450 (1991); *Ritz v. Ritz*, 229 Neb. 859, 429 N.W.2d 707 (1988).

Although Sandra did provide a list of monthly expenses which exceeded her 1996 net income by $3,305 per month, we note that these expenses included clothing, haircuts, allowance, and toiletries for Jill, which will be paid at least half of the time by Ronald, and rent and expenses for Jody, who is an adult child. Further, she includes in those expenses $1,000 per month for "business expenses," which are already taken into account in arriving at her net income for child support purposes. Consequently, we reduce the trial court's award of alimony to the sum of $200 per month for 36 months.

*Value and Allocation of Certain Marital Assets.*

Ronald asserts that the trial court erred in dividing the marital estate. As a general proposition, the Nebraska

Supreme Court has frequently said that the marital estate is to be divided so that a spouse receives one-third to one-half. *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995). However, property division is not subject to a rigid mathematical formula, but, rather, turns upon the facts and circumstances of each individual case in light of the statutory factors found in § 42-365. *Preston v. Preston*, 241 Neb. 181, 486 N.W.2d 902 (1992). The court will consider all pertinent facts in reaching an award that is just and equitable. *Van Newkirk v. Van Newkirk*, 212 Neb. 730, 325 N.W.2d 832 (1982). The ultimate test for determining an appropriate division of marital property is one of reasonableness. The division must, most of all, be reasonable. *Frost v. Frost*, 227 Neb. 414, 418 N.W.2d 220 (1988). In cases where the growth of the marital estate cannot be attributed to one party more than to another, the trial court may divide the estate equally. *Shockley v. Shockley*, 251 Neb. 896, 560 N.W.2d 777 (1997).

According to the trial court's calculations, Sandra's net award was $60,089 (51 percent), while Ronald's was $58,325 (49 percent). But Ronald challenges these figures, claiming the district court included certain assets and failed to consider certain unsecured debt. His argument focuses on the value of a computer, a Pacific Brokerage Services account, a Euro-Atlantic Securities account, and the balances of certain credit card debts.

*Credit Card Debts.*

Ronald was allocated the debt related to five credit cards. The district court assigned "unknown" balances, and consequently Ronald's share of the property includes no deduction for such debts. These included a First Bank Visa card, another card designated solely as First Bank but bearing a different account number than the Visa, a Citibank Visa card, an American Express Optima card, and an MBNA card. The trial court also awarded Ronald the debt balance of the Discover card at $612, which Ronald testified had a balance of $3,200, and a NationsBank Visa at $3,226, which he testified had a balance of $6,500. Ronald argues that the trial court abused its discretion in failing to determine the actual balances of these accounts.

It is true that the debts of the parties should be considered in making a property division in a dissolution of marriage action. See, e.g., *Preston v. Preston, supra*; *Hildebrand v. Hildebrand*, 239 Neb. 605, 477 N.W.2d 1 (1991). However, Sandra alleges that the trial court was correct in not placing a value on these accounts, because Ronald refused to comply with discovery requests to present documentation as to the value of the accounts at the time of separation. It is undisputed that Ronald was in the best position to produce records regarding the credit card accounts. Sandra testified that there were still many documents that had been asked for that had not been turned over to her and that she had wanted these documents to determine the amount of debt at the time the divorce was filed. Ronald testified that he did not remember being asked for this specific documentation in earlier discovery requests, but did remember their being requested in a notice to take deposition served on him in March. The deposition was taken March 7, 1997. He testified that statements for these bills continued to be sent to the family residence even after he moved out on August 5, 1996, because he felt Sandra needed to be able to see the monthly payments. He stated that most of the bills were opened when she gave them to him but that there were only 1 or 2 months they were not forwarded to him in a timely manner. However, when asked if it was correct that Sandra's attorney still did not have records for those accounts, he stated, "I don't think I have received them, no, I do not."

Although the testimony is in conflict, one thing is clear: The record contains no documentation as to the balances of these accounts on July 3, 1996 (date of divorce filing), August 1 (date of valuation of marital estate by trial court), or August 5 (date of separation). The trial court was consistent in requiring documentation of debt balances or values where either were disputed. These credit card debts were disputed and the documentation provided by Ronald was incomplete regarding, inter alia, the dates of the respective balances. Exhibit 34, a copy of a First Bank Visa statement dated September 24, 1996, was not received into evidence after Sandra objected that it was not the best evidence, and the court sustained the objection, stating that the cut-off time should be the date of filing, or at the latest, the

date of separation. Prior to offering the exhibit, Ronald had exhibits 34 through 39 marked for identification. After exhibit 34 was rejected, no offer was made of the remaining exhibits, and they are not in our record. Ronald does not assign as error the rejection of this exhibit. As such, we do not address whether the trial court erred in failing to receive this evidence and will express no opinion about the propriety of such rejection.

We note however that the date upon which the marital estate is valued should be rationally related to the property composing the marital estate. See *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998). The trial court's decision to use August 1, 1996, as the cut-off date for the marital estate appears to be rationally related to the property composing the marital estate.

Ronald assigned balances to all of the disputed accounts except one on the joint property statement. He assigned the First Bank balance at $1,800, the Citibank at $5,800, the American Express at $5,100, the Discover at $3,200, the MBNA at $8,200, and the NationsBank at $6,500. Sandra offered exhibit 25, a May 10, 1996, statement for the Discover card, and exhibit 26, a May 21 statement for the NationsBank card, to show that the balances on these accounts were $612 and $3,226, respectively, on those dates. She listed the balances of the other accounts as "unknown."

Ronald testified that he had used the First Bank card "a little bit" since the separation but had not used the Citibank, the American Express Optima, the Discover, or the NationsBank cards during the pendency of the divorce. He explained the disparity in the Discover balance by stating that he believed it had been used a lot in May and June by both the parties. He testified that the American Express Optima account was opened in his name only but was used solely to buy Jody a computer in late 1995. Ronald maintained that he requested that no new charges could be placed on the Discover account after July or August or on the NationsBank account after August. However, he does not provide any documentation in this regard.

Ronald did not offer any documentation as to what had been charged on any of these accounts prior to or after the separation. Nor does he offer any explanation as to why the documentation

is not present, even though he testified that he received the mail from Sandra and it is quite clear that she asked him to produce this documentation during discovery. Although Ronald testified as to the balances "when I called them to see what the balances were," he did not testify concerning when he made these telephone calls. It could have been at the time of separation or the day before trial. We simply have no way of determining the date of the balances he testifies to, nor do we know what the balances were at the time of separation or on August 1, 1996, the date the court used to determine the value of the marital estate. Ronald's testimony also does not explain what the charges were made for, when they were made, or why the balances were so high, when he claims to have liquidated the Pacific Brokerage Services account to pay credit card debt. Thus, we have no way of determining if the debt was incurred for the benefit of both parties before separation or is primarily debt incurred for Ronald's benefit after separation.

Based on the evidence before us, we must agree with the trial judge when he explained that Ronald could have requested a payment history on these accounts back to the date of filing or the date of separation and that he had no way to determine if cash advances or charges had been made by Ronald after the separation. From the discovery requests, Ronald's deposition, and the joint property statement, Ronald's awareness that these debts were going to be contested is undisputable. Yet, he failed to present any documentary evidence to support his assigned balances or to offer any explanation of why he failed to disclose these items to Sandra. If the evidence, as presented by the record, is in conflict, an appellate court considers, and may give weight to, the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). The decision to award these debts at an unknown balance or at a balance shown on an earlier statement involves a matter of credibility which is properly left to the discretion of the trial court. See *id.*

*Computer.*

Ronald argues that the trial court disregarded his testimony concerning the value of his computer and accepted Sandra's

offered appraisal even though it was performed by one of her former coworkers. However, a close examination of the record shows that in its award the trial court did not specifically assign a value to the computer. Rather, it awarded all household furnishings and equipment shown on the property statement which were in Ronald's possession, which included the computer, at a value of $3,050. This is $400 less than Ronald himself valued such property and $1,650 less than Sandra valued his property. The trial court's order simply does not support Ronald's allegation that it adopted Sandra's value on the computer.

*Pacific Brokerage Services Account.*

The Pacific Brokerage Services account was awarded to Ronald at a value of $3,655. On appeal, he argues that the court erred in awarding him the Pacific Brokerage Services account at that value, because at the time of trial the account had a $0 balance, and the money was used to pay marital debt.

Exhibit 16 shows the account balance to be $3,655 on August 30, 1996, approximately 3 weeks after the parties separated. At trial, Ronald testified that he had removed the funds from this account during the divorce proceeding because his income was not sufficient to pay the monthly bills. He explained that he felt this came within the "usual course of business" exception to the nonhypothecation order and offered exhibit 31 to show how he had used these funds to service the parties' credit card debts, to pay insurance premiums, and to purchase Jill's furniture. This exhibit is a computer printout generated by Ronald entitled "Check Register." It does not purport to list all of the checks written on whatever account is referenced, but it does show that Ronald spent approximately $3,675 servicing credit card debts, $486 on Jill's furniture, and $249 on automobile insurance. Ronald offered no canceled checks or credit card statements to reflect that he had, indeed, paid the amounts listed for the purposes shown on his exhibit 31.

Sandra argues that Ronald violated the nonhypothecation order when he liquidated this account and thus should be held responsible for his actions. She asserts that she was also paying substantial bills and yet did not have to liquidate an investment account to service her debt. She contends that charging Ronald

with the full value of the account at the time of separation is fair in light of the facts and circumstances. We agree.

The August 5, 1996, court order states, "Both the petitioner and respondent shall be restrained from selling, assigning, concealing, or liquidating any of the assets of the parties except in the usual course of business during the pendency of this action." The record shows that the account had a balance of $3,655 on August 30, and Ronald testified that he liquidated the account prior to trial. Nowhere in the record do we have indication, nor does Ronald suggest, that he petitioned the court for permission to liquidate the account to pay marital debt. Nor does he provide his monthly expenses to show why his monthly income was insufficient to service this debt. Apparently, the trial court either was not satisfied with the accounting Ronald gave at trial or did not believe the credit card debts paid per exhibit 31 were proper marital debts. Credibility seems to have played a significant role in this case. This, being a credibility issue, must be left to the discretion of the trial court absent an abuse of discretion. See *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997). We cannot say that this was an abuse of discretion. The trial court's order is affirmed in this regard.

*Euro-Atlantic Securities Account.*

Ronald was also awarded the Euro-Atlantic Securities account at a value of $5,223. Exhibit 18 shows that a check for this amount was sent to Ronald at the parties' address on August 2, 1996, 3 days before he moved out of the family residence but approximately 1 month after the petition for divorce was filed and the ex parte nonhypothecation order was entered. Ronald testified that $2,000 of this sum was used to pay the property taxes on the parties' rental house, with the remainder placed in the parties' joint bank account, available to both of the parties. Again, Ronald offered no documentation to support either these expenses or the deposit. Sandra testified that to her knowledge she did not receive any of the money from this account.

In the decree, there is a parenthetical behind this award which states, "Cash disbursed to [Ronald] during the pendency of this action in violation of the non-hypothecation order issued by Judge Murphy on July 3, 1996." We note that the order entered on July 3 was an ex parte nonhypothecation order. Neb.

Rev. Stat. § 42-357 (Reissue 1993) provides, in pertinent part, that such an order shall remain in force for no more than 10 days or until a hearing is held thereon, whichever is earlier. We have nothing in our record which shows that a hearing was held until August 5. Thus, the ex parte nonhypothecation order expired on July 13, and the cash disbursement from the Euro-Atlantic Securities account which occurred on August 2 could not have been in violation of the July 3 ex parte nonhypothecation order. As such, the trial court erred in finding that Ronald violated the nonhypothecation order.

However, the trial court set an August 1, 1996, cut-off date for valuing the marital estate. On that date, the value of the Euro-Atlantic Securities account was $5,223. Although the liquidation of the account may not have violated a nonhypothecation order, inclusion of its value in the marital assets as of a given date is proper so long as that date is rationally related to the property composing the marital estate. See *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998). Such rational relationship exists here.

Where the record demonstrates that the decision of the trial court is correct, although such correctness is based on a different ground than that assigned by the trial court, the appellate court will affirm. See *Gustin v. Scheele*, 250 Neb. 269, 549 N.W.2d 135 (1996). The trial court's order awarding the Euro-Atlantic Securities account to Ronald at a value of $5,223 is affirmed, although we do not do so because its distribution violated a nonhypothecation order; rather, we affirm because we cannot say that the district court's rejection of Ronald's accounting was an abuse of discretion.

*Debts as Nondischargeable in Bankruptcy.*

The trial court ordered that "all of the debts assigned to [Ronald] are in the nature of support and maintenance for [Sandra] and shall be non-dischargeable in bankruptcy." On appeal, Ronald argues that such an order is not supported by the evidence and does not treat the parties equally, because it does not limit Sandra's ability to discharge her debt in bankruptcy.

The U.S. Bankruptcy Code excepts certain categories of debt from a debtor's discharge granted in certain enumerated

bankruptcies. Among the debts rendered nondischargeable are debts owed

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, *but not to the extent that—*
>
> (A) such debt is assigned to another entity . . .
>
> (B) *such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support*[.]

(Emphasis supplied.) 11 U.S.C. § 523(a)(5) (1994). Thus, under this section, if a debt is "actually in the nature of" alimony, maintenance, or support of a spouse, former spouse, or child of the debtor, it is nondischargeable in bankruptcy.

▮▮▮▮ The trial court's decision to designate the debts allocated to Ronald as support and maintenance was an obvious attempt to ensure that if Ronald does go into bankruptcy, he cannot discharge the debts assigned to him. However, the dischargeability of a debt is a question of federal bankruptcy law, and as emphasized above, § 523(a)(5)(B) expressly provides that a designation of a debt as alimony, maintenance, or support to a spouse, former spouse, or child will render it nondischargeable only if "such liability is actually in the nature of alimony, maintenance, or support."

▮▮ In *In re Moeder*, 220 B.R. 52 (B.A.P. 8th Cir. 1998), the U.S. Bankruptcy Appellate Panel of the Eighth Circuit, addressing, inter alia, the provisions of § 523(a)(5), observed that "whether a particular debt constitutes 'alimony, maintenance or support' or rather constitutes a property settlement is a question of federal bankruptcy law, not of state law." 220 B.R. at 55. The critical issue in determining whether a debt constitutes alimony, maintenance, or support for purposes of this exception to discharge is the intent of the parties and the function the award was intended to serve at the time of the divorce. *Id.*

> Factors to be considered by the courts in determining whether an award arising out of marital dissolution pro-

ceedings was intended to serve as an award for alimony, maintenance or support, or whether it was intended to serve as a property settlement include, but are not limited to: the relative financial conditions of the parties at the time of the divorce; the respective employment histories and prospects for financial support; the fact that one party or another receives the marital property; the periodic nature of the payments; and whether it would be difficult for the former spouse and children to subsist without the payments.

*Id.* at 55. The *In re Moeder* court concluded that the divorce court was concerned with balancing the income and earning capacities of the parties and providing proper care and support for the minor child when it ordered the husband to pay certain debts. Thus, it determined that the obligations at issue were nondischargeable.

■ Although the trial court's designation of the debts as support might be one indication of the "function" the award was intended to serve, it is obviously not conclusive. And certainly a declaration that the debts are "nondischargeable in bankruptcy" is not binding on the bankruptcy court. Rather, as is clear from *In re Moeder*, a bankruptcy court will apply all of the principles enumerated above in determining whether an obligation is a support obligation or a nonsupport obligation merely disguised as one for support.

While not directly implicated by the trial court's decree in the present case, there is another category of debt incurred in the course of a divorce or separation that is nondischargeable. For completeness' sake, we mention it briefly. It is found at 11 U.S.C. § 523(a)(15) and was also at issue in *In re Moeder*. "Section 523(a)(15) excepts from discharge those debts arising out of marital dissolution proceedings that do not constitute nondischargeable alimony, maintenance or support under § 523(a)(5); i.e. property settlement awards." *In re Moeder*, 220 B.R. at 54. As noted by the *In re Moeder* court, this exception to discharge was added in 1994 and is itself subject to certain exceptions which we need not detail here. Suffice it to say that § 523(a)(15) renders such debts nondischargeable in bankruptcy even though they do not meet the criteria of § 523(a)(5), but

they will nevertheless be dischargeable if either of two enumerated exceptions apply. See *In re Moeder, supra.*

In sum, based upon the clear language of § 523 and the rationale of *In re Moeder, supra*, if and when the dischargeability of the relevant debts becomes an issue, a bankruptcy court will look beyond the designation in the award and determine the dischargeability of relevant debts based on federal bankruptcy law. Thus, the trial court's nonbinding declaration cannot be said to be an abuse of discretion.

*Guardian Ad Litem Fees.*

Ronald argues that considering the circumstances and general equities of this case, including the fact that the parties have joint legal and physical custody, the trial court erred in requiring him to pay the entire guardian ad litem fee of $763. He proposes that this fee should have been split evenly between the parties.

The allowance, amount, and allocation of a guardian ad litem fee are matters within the initial discretion of the trial court, necessarily involve consideration of the equities and circumstances of each particular case, and will be set aside on appeal only when there appears to be an abuse of discretion by the trial court. *Hafer v. Hafer*, 3 Neb. App. 129, 524 N.W.2d 65 (1994), citing *Smith v. Smith*, 222 Neb. 752, 386 N.W.2d 873 (1986). Although we may have ordered otherwise, it is not our prerogative to decide this issue anew. We cannot say that ordering Ronald to pay the entire $763 is untenable and unfairly deprives him of a substantial right or a just result. Therefore, we affirm that portion of the trial court's order.

## CONCLUSION

Sandra's 1996 income was an anomaly and fails to reflect her true earning capacity. The trial court erred in considering only her 1996 income when it determined child support and alimony. As such, those awards are modified as set forth in this opinion. The trial court's division of the marital assets and debts does not constitute an abuse of discretion and is therefore affirmed. The court's attempt to make these debts nondischargeable was not an abuse of discretion, nor was its order requiring Ronald to pay

the entire guardian ad litem fee. We affirm as modified, as set forth herein.

AFFIRMED AS MODIFIED.