LAURIE SMITH CAMP, APPELLEE AND CROSS-APPELLANT,
v. JON A. CAMP, APPELLANT AND CROSS-APPELLEE.
709 N.W.2d 696

Filed February 7, 2006.    No. A-04-685.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.

John W. Ballew, Jr., and Gary B. Schneider, of Ballew, Schneider, Covalt, Gaines & Engdahl, P.C., L.L.O., for appellee.

INBODY, Chief Judge, and CARLSON and CASSEL, Judges.

CASSEL, Judge.

## I. INTRODUCTION

This appeal arises out of the dissolution of the marriage of Jon A. Camp and Laurie Smith Camp. Jon appeals the order of the district court for Lancaster County that enforced the judgment which we had affirmed and modified on direct appeal. Laurie cross-appeals. We conclude that (1) the law-of-the-case doctrine precludes us from considering Jon's argument that the district court should have considered certain liabilities in dividing certain accounts; (2) by granting a money judgment, the district court enforced the original judgment dividing marital property but improperly expanded the original judgment by awarding interest on the money judgment retroactive to the date of the original decree; (3) the district court did not abuse its discretion in applying payments on the judgment first to interest and then to the principal; and (4) the district court did not abuse its discretion in denying Laurie's request that Jon reimburse her for partnership and corporation income which she did not receive but for which she paid taxes. We therefore affirm as modified.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

The parties' marriage was dissolved by the district court on April 10, 2002. At the time of the dissolution, Jon and Laurie each owned a 39.95-percent interest in the Haymarket Square Partnership (HMS). The parties and other partners in HMS had also established CH, Ltd., a corporation with the same division of ownership as HMS. Henceforth, we refer to HMS and CH collectively as "the entities." The district court decreed:

> Jon and Laurie shall each receive 39.95 percent of the cash accumulated in all HMS and CH checking and savings accounts as of December 31, 2000. Jon shall pay to Laurie her appropriate 39.95 percent of these accounts within thirty (30) days of this order, regardless of the current balances in such accounts.

Additionally, the decree ordered Jon to pay a money judgment to Laurie in the amount of $3,266,152 in annual installments of

$500,000 plus accrued interest at the rate of 5.442 percent per year, with the first payment to be due within 60 days of the decree. This money judgment included Laurie's interest in the entities, but not the cash in the entities' checking and savings accounts. The district court authorized Jon to prepay the judgment at any time. On July 26, 2002, Jon filed a notice of his intent to appeal the dissolution decree to this court.

On October 15, 2002, Laurie filed a supplemental petition for declaratory judgment in the dissolution action. She alleged that after she had filed her 2001 federal and state income tax returns in which she declared distributions from the entities, Jon had submitted "K-1 forms" to the Internal Revenue Service and the Nebraska Department of Revenue attributing to Laurie income from HMS that she did not receive. Laurie stated that as a result, she filed amended tax returns and paid additional taxes. Laurie requested a declaratory judgment to determine her liability for "past and future 'phantom income'" from the entities. In response, Jon filed a demurrer. The district court sustained Jon's demurrer, stating that it would not act on Laurie's petition for declaratory judgment while the appeal to this court was pending.

On December 16, 2003, we released our opinion in *Camp v. Camp*, No. A-02-832, 2003 WL 22948124 (Neb. App. Dec. 16, 2003) (not designated for permanent publication) (*Camp I*). Jon complained that the district court had erred in several respects in its division of the parties' property. In part, we addressed the district court's award of 39.95 percent of the entities' cash accounts to Laurie as follows:

> Jon contends that the trial court erred in requiring him to pay to Laurie 39.95 percent of the HMS and CH checking and savings accounts as of December 31, 2000, within 30 days of the order, "regardless of the current balances in such accounts." Jon's first argument is that the court lacked jurisdiction over these funds owned by the entities when neither Jon nor Laurie, acting alone, controlled the affairs of either entity. We reject this claim. As we said a good number of pages ago, the court has the equitable power to distribute the parties' assets, and that is all it has done by the portion of its decree under discussion here.

Jon also argues that Laurie should not be awarded the cash in the bank accounts of the entities, since the trial court relied upon [Laurie's appraiser's] income theory rather than a liquidation theory. [Laurie's appraiser] did not use the cash balances of the entities in calculating his valuation because it was based on net operating income. Jon asserts that it is irrational to give Laurie 39.95 percent of the assets in the bank at yearend 2000 without making her responsible for the then-existing debts or liabilities which Jon pegged at over $156,000 as of April 29, 2001.

While the decree does not contain the amount in the accounts on such date, and we have not found it ourselves in the voluminous record, making an equal division between the two parties of the cash held by two entities which are admittedly marital property and which are being divided equally is not irrational or an abuse of discretion. This assignment of error is without merit.

*Camp I*, 2003 WL 22948124 at *16. This court adjusted Jon's payment schedule, recalculated the valuation of buildings owned by the entities, and reduced the judgment accordingly as follows:

As a result of our decision, the judgment awarded to Laurie against Jon is reduced to $2,819,511 with interest accruing at 5.442 percent per annum from and after April 10, 2002, until the judgment is paid in full. This is a reduction of the trial court's judgment by $446,641. The judgment is to be paid by an installment of $325,000 plus accrued interest 60 days after the date of our mandate, followed by like payments on the yearly anniversary of our mandate together with accrued interest until the judgment is paid in full. The judgment is secured by Jon's interest in HMS and CH, and it may be prepaid in full or part at any time.

*Camp I*, 2003 WL 22948124 at *20. We affirmed the district court's decree, as modified.

On February 3, 2004, Laurie filed a motion to spread the mandate and for supplemental orders regarding reconciliation of the payment schedule on the revised money judgment and supplemental orders "requiring disbursement to [Laurie] of her 39.95% of [the entities'] checking and savings accounts as of December 31, 2000 in the amount of $130,595.33."

On March 9, 2004, Laurie filed an amended petition for declaratory judgment and supplemental money judgment. Laurie reiterated the allegations in her petition for declaratory judgment and additionally alleged that after she had prepared and submitted federal and state income tax returns for 2002, Jon submitted K-1 forms to the Internal Revenue Service and the Nebraska Department of Revenue, which forms attributed to Laurie income from the entities that she had not received. Laurie complained that as a result, she had to file amended state and federal income tax returns for 2002 and pay additional taxes for income from the entities which she did not receive. Laurie requested a declaratory judgment determining her status both as a partner in HMS and as a shareholder in CH in 2001 and 2002, and Laurie requested a supplemental money judgment against Jon for the income from the entities which Laurie did not receive but for which she paid taxes.

On March 24, 2004, Jon filed a motion for an order nunc pro tunc to clarify the terms of the decree. Specifically, Jon asked the court to clarify the judgment to provide that the amount due Laurie from the entities' accounts was the net amount after the payment of accounts payable and to include in the money judgment the amount due from Jon to Laurie from the entities' accounts. Also on March 24, Jon filed a motion to settle money judgment, requesting that any early payments he made on the judgment be applied first to the principal amount and then to accrued interest.

On March 25, 2004, the district court conducted a hearing on the parties' various motions. We divide our summary of the evidence into sections pertaining to the topics raised in the parties' various motions and relevant to this appeal.

### 2. EVIDENCE AT TRIAL

#### (a) Entities' Accounts

Laurie testified and presented other evidence that the balances of the entities' accounts as of December 31, 2000, totaled $326,896.96, and requested 39.95 percent of that sum, or $130,595.34, plus interest accruing since April 10, 2002, the date of the dissolution decree. Laurie testified that Jon did not make the account information available at the time of the

original trial and that she did not receive the entities' bank statements until March 17, 2003. Laurie admitted that she did not request the information from the bank.

The district court received evidence summarizing the entities' assets and liabilities as of December 31, 2000. Jon testified that as of that date, there were outstanding liabilities that had not been paid. According to Jon, the entities' liabilities include such things as accounts payable, tenants' deposits, payroll liabilities, and real estate taxes. Jon requested that the district court award Laurie 39.95 percent of $82,443, an amount which takes into account the entities' liabilities as of December 31, 2000. Jon testified that he would have brought the liabilities to the district court's attention at the time of the initial trial but that the necessary tax returns had not been prepared at that time.

### (b) K-1 Forms

Laurie stated that on her 2001 and 2002 income tax returns, she initially declared only the distributions from the entities which she had received. According to Laurie, after her income tax returns were due and filed for each of those years, she received K-1 forms from Jon "passing through" to her 39.95 percent of the income tax liability for the entities for 2001 and 2002. The figures on the K-1 forms included income which Laurie did not receive. Laurie testified that as a result, she filed amended state and federal returns for both 2001 and 2002 reflecting the income figures on the K-1 forms and declaring income from the entities which she did not receive. Laurie summarized that in 2001 and 2002, she paid income tax on $48,892 which she did not receive, and that she requested a money judgment in that amount.

Laurie testified that when she was a part of the entities, distributions would not be made until all debt was paid and interest holders would receive all amounts listed on K-1 forms. This continued until 2000, when Jon terminated distributions to Laurie and the other interest holders. Laurie admitted that distributions from the entities were not taxable as ordinary income and that the income and losses from the entities passed through directly to the interest holders in proportion to their respective holdings. Laurie acknowledged that the K-1 form reflects the recipient's share of the earnings and losses for the year.

Jon testified that he prepared the K-1 forms. He explained that the K-1 forms show each partner's or shareholder's share of the corporation's income. Jon denied preparing the K-1 forms from phony books or a double set of books, and he denied attributing phantom income to Laurie.

Ron Ecklund, a certified public accountant and certified financial planner, testified that on a year-by-year basis, there is not a direct dollar-for-dollar correlation between K-1 forms and actual distributions made to shareholders and partners. He explained that many cash disbursements do not result in expense deductions for the entity and that some cash receipts, such as borrowing or sale of assets, do not result in income for the entity. Ecklund stated that over a long period of time, there is an indirect relationship between the income of the partnership or corporation and the disbursements to partners and shareholders, but that "it will vary" on a year-by-year basis. Ecklund testified that in his opinion, it would be inappropriate to treat distributions as income for individual tax return purposes and the proper practice would be to request a K-1 form from the corporation or partnership.

### (c) Payments on Judgment

The district court received records from the clerk of the district court demonstrating that on August 6, 2002, Jon began paying on the dissolution decree's money judgment, and that he made substantial payments thereafter. The district court also received an amortization schedule which showed the effect of applying Jon's payments first to interest owing on the judgment and then to the principal, as opposed to applying payments first to the principal and then to the interest.

Ecklund testified regarding whether early payments toward debt should go first to the principal or the interest. Ecklund stated that he did not know whether general accounting principles address the issue. However, he stated that banking regulations in the area of agricultural lending provide that such payments go first to the principal and then to the interest.

### 3. Resolution

The district court found that any payments Jon made toward this court's reduced judgment must be first applied to interest and

then to the principal. The district court denied Jon's request for an order nunc pro tunc, noting that Laurie was, in effect, awarded a judgment against Jon for her 39.95-percent share of the entities' accounts and that an order nunc pro tunc cannot be used to enlarge the judgment originally rendered. The district court granted Laurie's motion to spread mandate and for issuance of supplemental orders. The court found that Laurie's 39.95-percent share of the entities' accounts as of December 31, 2000, was $130,595.33 and entered judgment in favor of Laurie, along with interest at the rate of 5.442 percent per year from and after April 10, 2002. The district court denied Laurie's amended petition for declaratory judgment and supplemental money judgment, because the evidence showed no direct relationship between the cash distributions and taxable income from the entities; nor was there evidence that Jon had erroneously prepared the K-1 forms or charged Laurie with nonexistent taxable income.

Jon appeals the district court's order on the various motions, and Laurie cross-appeals.

## III. ASSIGNMENTS OF ERROR

Jon assigns that the district court erred in (1) granting a supplemental money judgment in favor of Laurie and (2) failing to credit Jon's prepayment of the judgment first to the principal and then to the accrued interest.

On cross-appeal, Laurie assigns that the district court erred in overruling her amended petition for declaratory judgment and supplemental money judgment.

## IV. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge; this standard of review applies to the trial court's determinations regarding division of property, alimony, and attorney fees. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

## V. ANALYSIS

### 1. ENTITIES' ACCOUNTS

Jon argues that the district court erred in not consider- ing the entities' outstanding checks, taxes, and tenant security

deposits in determining Laurie's share of the entities' accounts. We addressed this argument in *Camp I*, 2003 WL 22948124 at *16, as follows:

> Jon asserts that it is irrational to give Laurie 39.95 percent of the assets in the bank at yearend 2000 without making her responsible for the then-existing debts or liabilities which Jon pegged at over $156,000 as of April 29, 2001.
>
> While the decree does not contain the amount in the accounts on such date, and we have not found it ourselves in the voluminous record, making an equal division between the two parties of the cash held by two entities which are admittedly marital property and which are being divided equally is not irrational or an abuse of discretion.

Under the law-of-the-case doctrine, the holdings of the appellate court on questions presented to it in reviewing proceedings of the trial court become the law of the case; those holdings conclusively settle, for purposes of that litigation, all matters ruled upon, either expressly or by necessary implication. *Houston v. Metrovision, Inc.*, 267 Neb. 730, 677 N.W.2d 139 (2004). By necessary implication, in *Camp I*, we rejected Jon's argument that the district court erred in not considering the entities' liabilities in dividing the entities' accounts. That finding has become the law of the case, and we are precluded from reconsidering it.

We also note that Jon attempted to raise the issue of entity liabilities via a request for an order nunc pro tunc, asking the court to clarify the terms of the decree. As the district court correctly observed, it is not the function of an order nunc pro tunc to change or revise a judgment or order, or to set aside a judgment actually rendered, or to render an order different from the one actually rendered, even though such order was not the order intended. See *Fay v. Dowding, Dowding*, 261 Neb. 216, 623 N.W.2d 287 (2001). The function of a nunc pro tunc order is to correct a clerical or scrivener's error. *Id.* The liabilities issue was not the proper subject for a nunc pro tunc order, and we conclude that the district court did not err in overruling Jon's request for such an order.

Several of Jon's other arguments attack the original dissolution decree and this court's opinion in *Camp I*. In essence, Jon questions "whether it was equitable to order the distribution of

the entities['] cash to Laurie." Brief for appellant at 13. As discussed above, our opinion in *Camp I* is the law of the case, and we decline to revisit those issues.

Jon contends that the portion of the dissolution decree which ordered him to pay Laurie "her appropriate 39.95 percent" of the entities' accounts did not constitute a money judgment and that the order from which he now appeals therefore constitutes a supplemental money judgment. Because that portion of the decree did not order Jon to pay Laurie a specific dollar amount, we agree that the dissolution decree was not a money judgment. See, *Lee Way Motor Freight, Inc. v. Welch*, 764 P.2d 191 (Okla. 1988) (money judgment must state with certainty amount to be paid); *State ex rel. Fick v. Miller*, 252 Neb. 164, 560 N.W.2d 793 (1997). Under the same reasoning, we reject the district court's characterization of this court's affirmance in *Camp I* as a money judgment. Although not a money judgment, we recognize that the disputed portion of the original decree and our affirmance specified a means for determining a specific amount. See *U. S. v. Schaefer Brewing Co.*, 356 U.S. 227, 78 S. Ct. 674, 2 L. Ed. 2d 721 (1958) (final judgment for money must, at least, determine amount or specify means for determining amount). Of course, the problem in this case was that in the trial prior to *Camp I*, for whatever reason, the parties did not present evidence of the balances of the entities' accounts.

Because the record lacked information relevant to the enforcement of this court's mandate, Laurie filed a motion for supplemental orders "requiring disbursement to [Laurie] of her 39.95% of [the entities'] checking and savings accounts as of December 31, 2000 in the amount of $130,595.33." Jon suggests that the original decree could have been enforced through contempt proceedings. A civil contempt is instituted to preserve and enforce the rights of private parties to a suit, to compel obedience to orders and decrees made to enforce such rights, and to administer the remedies to which the court has found the parties to be entitled. *McDermott v. McDermott*, 8 Neb. App. 860, 602 N.W.2d 676 (1999). See *Eliker v. Eliker*, 206 Neb. 764, 295 N.W.2d 268 (1980). While a contempt proceeding may have been effective in enforcing the judgment, it is not the sole means of doing so. A court that has jurisdiction to make a decision also

has the power to enforce it by making such orders as are necessary to carry its judgment or decree into effect. *Davis v. Davis*, 265 Neb. 790, 660 N.W.2d 162 (2003). To the extent that the district court determined the principal amount represented by Laurie's 39.95-percent share of the checking and savings accounts, the court's ruling on Laurie's motion for supplemental orders only enforced a judgment, rendered in equity, determining the division of the parties' property. Jon characterizes the district court's ruling as an increased money judgment, a supplemental money judgment, or a new money judgment, but in merely enforcing the judgment as to the principal sum of the amount originally ordered to be paid by Jon, the district court did not expand or alter any existing provision.

■ We do, however, conclude that the district court expanded the judgment when it awarded Laurie interest on her share of the entities' accounts. Having concluded that there was no previous money judgment on the issue of Laurie's share of the entities' accounts, we find that it was improper for the district court to assess interest accruing from and after April 10, 2002, the date of the dissolution decree. See *Gallner v. Gallner*, 257 Neb. 158, 595 N.W.2d 904 (1999) (interest does not accrue under postjudgment interest statute until debt becomes due). Jon's obligation to pay Laurie her share of the accounts did not become a money judgment until the court granted Laurie's motion for supplemental orders, at which time the district court enforced the original order by entry of a money judgment. Thus, we modify the district court's judgment to provide that interest shall accrue on the entities' accounts judgment as of May 6, 2004, the date of the enforcement judgment, at the rate of 3.008 percent per annum, the rate of interest as of that date.

## 2. PAYMENTS ON JUDGMENT

■ We concluded in *Camp I* that interest on the modified judgment was to accrue from April 10, 2002, the date of the original decree. See *Gallner v. Gallner, supra*. Jon made payments on the judgment before April 10 and argues that the district court erred in crediting his prepayments on the judgment first to accrued interest and then to the principal. As a general rule, interest on a judgment or debt is computed up to the time

of the first payment, and that payment is first applied to interest and the balance to principal. *Ramaekers, McPherron & Skiles v. Ramaekers*, 4 Neb. App. 733, 549 N.W.2d 662 (1996). Although Jon characterizes his payments as "prepayments"—asserting that the fact that *Camp I* authorized Jon to prepay the judgment means that payments cannot be applied first to interest—we disagree that the characterization of his payments as "prepayments" changes the general rule.

In *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995), a dissolution case, the Nebraska Supreme Court likened monthly payments of interest and principal on a cash property division to amortized loan payments on a home loan. In *Thiltges*, the appellant argued that the district court did not equitably divide the parties' marital estate because it failed to require the payment of interest on her deferred property award, which was payable over 12 years. The Nebraska Supreme Court has found that under Neb. Rev. Stat. § 45-103 (Reissue 2004), interest on a judgment providing for installment payments is to accrue on each individual installment from the date it becomes due, and that a trial court may, in its discretion, award interest on deferred installments payable as part of a marital property distribution. See *Thiltges v. Thiltges, supra*. The court in *Thiltges* modified the decree to require interest to be paid from the date of the decree. In determining that an award of interest would not impose an undue burden on the appellee, the court observed:

> Here, appellee has been ordered to make monthly principal payments of a fixed amount over a relatively long period of time. Uniform monthly payments over a long term call for monthly payments of interest in addition to principal, similar to the type of payments made on most home mortgages, commonly referred to as "amortized loans." Glenn G. Munn, Encyclopedia of Banking and Finance 47 (F.L. Garcia ed., 8th ed. 1983). Payments made on amortized loans are of a fixed amount, such payments allocated first to interest and then to principal. Early in the loan, most of the fixed payment is allocated to interest, but as the principal is paid down, a greater portion of each payment is allocated to principal.

*Thiltges*, 247 Neb. at 380, 527 N.W.2d at 859-60.

Although, as Jon points out in his brief, the payments in the instant case are annual rather than monthly, we find *Thiltges* to be instructive. Consistent with the dicta in *Thiltges v. Thiltges, supra*, and with the general rule in *Ramaekers, McPherron & Skiles v. Ramaekers, supra*, we conclude that the district court did not abuse its discretion in applying Jon's payments first to accrued interest and then to the principal.

### 3. K-1 FORMS

On cross-appeal, Laurie argues that the district court erred in denying her request for a money judgment in the amount of income from the entities, which income she did not receive but for which she paid taxes. Laurie contends that while she does not dispute the district court's determination that there is a difference between the distributions which interest holders receive and the amount for which they pay taxes, "in the context of this marital dissolution proceeding it is patently unfair and inequitable that she be required to pay tax on income that inures to the benefit of Jon and enhances the value of assets awarded to Jon." Brief for appellee on cross-appeal at 22. Laurie argues that because she no longer has an interest in the entities, she derives no benefit from the income which was not distributed to her, unlike interest holders in the entities—mainly Jon.

The answer to Laurie's argument rests in timing. Ecklund testified that on a year-by-year basis, the K-1 forms do not directly correlate with distributions to interest holders, because many cash disbursements do not result in expense deductions for a partnership or corporation and some cash receipts do not result in income for the entity. He explained that over a long period of time, there may be an indirect correlation between the K-1 forms and actual distributions to interest holders. Pursuant to the dissolution decree and this court's affirmance, Laurie received a money judgment for her 39.95-percent interest in the entities, apart from the cash in the entities' checking and savings accounts. Jon was ordered to make yearly installment payments for the judgment, to continue until paid in full, with interest to accrue from April 10, 2002. Under the judgment, Laurie will receive undistributed entity income long after she has ceased paying taxes on entity income, and part of the judgment will

include income for which Laurie has already paid taxes. In effect, because the judgment correlates with Laurie's interest in the entities, Laurie was awarded her share of the entities' income for which she paid taxes in 2001 and 2002; she was merely receiving it over an extended period of time.

In a dissolution action, the court will consider all pertinent facts in reaching an award that is just and equitable. The ultimate test for determining an appropriate division of marital property is one of reasonableness. The division must, most of all, be reasonable. *Halouska v. Halouska*, 7 Neb. App. 730, 585 N.W.2d 490 (1998). Because the effect of the judgment was to award Laurie the entity income for which she paid taxes in 2001 and 2002, we conclude that the district court did not abuse its discretion in denying her request for a money judgment.

## VI. CONCLUSION

Concerning Laurie's share of the entities' accounts, we modify both the date from which interest is to accrue and the interest rate, but we otherwise affirm the district court's order.

AFFIRMED AS MODIFIED.